FILED

SEP 14 2012

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

MARCUS BRADLEY, JASON GOODSON,
TORE HARRIS, ERIC JOHNSON, ELWOOD
MAYFIELD, GABRIEL POSEY, LAWRENCE
SMITH, JR. AND MILTON WILLIAMS,

      PLAINTIFFS,

vs.

CASE NO: 3:12CV669

**COMPLAINT**

**JURY TRIAL DEMANDED**

THE CITY OF RICHMOND, VIRGINIA,
Serve:
Allen L. Jackson, Esq. City Attorney
900 E Broad Street, Suite 300
Richmond, VA 23219

      DEFENDANT.

---

## COMPLAINT

**NOW COMES the PLAINTIFFS,** MARCUS BRADLEY, JASON GOODSON, TORE HARRIS, ERIC JOHNSON, ELWOOD MAYFIELD, GABRIEL POSEY, LAWRENCE SMITH, JR. AND MILTON WILLIAMS, (Hereafter jointly referred to as "PLAINTIFFS") by and through Donald McEachin and Curtis M. Hairston, Jr., of McEachin & Gee Law Firm, and Debra Nolan (pending pro hoc vice admission) and Lorenzo Williams (pending pro hoc vice admission) and bring this action for damages and other legal and equitable relief from the DEFENDANT CITY OF RICHMOND due to its violation of the laws proscribing discrimination based on race and retaliation. In support of their claims against the DEFENDANT, each of the PLAINTIFFS states as follows:

# I.    **INTRODUCTION**

1.    This is an action brought by the PLAINTIFFS, all African-American's, for blatant intentional racial discrimination throughout the tenure of their employment with the CITY OF RICHMOND, as well as retaliation subsequent to the PLAINTIFFS opposition to said discrimination. DEFENDANT'S acts of discrimination and retaliation are in violation of the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1981 et. seq.; the 1991 Civil Rights Act, as amended, 42 U.S.C. § 1981a et. seq. and; Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e et. seq.

The PLAINTIFFS are all employees of the CITY OF RICHMOND working in the Department of Public Utilities-Water Maintenance Division[1].    When initially hired, each of the PLAINTIFFS believed they would have the opportunity to progress upward, acquiring increased skills, and greater compensation typically accompanying higher skill sets. However, throughout their employment it became clear to the PLAINTIFFS that they would not be afforded the same opportunities for upward progression as given to their Caucasian counter-parts due to long-standing racial animus held by the predominately Caucasian supervisory staff.

The disparate treatment is reflected by the DEFENDANT'S placement of the PLAINTIFFS into the position of Pipeline Technician 1 (hereafter "Pipefitter") within the DIVISION, where each remained throughout their subsequent years of employment. The PLAINTIFFS remained within the lowest pay range of the position indefinitely due to the DEFENDANTS intentional refusal to provide the necessary training for advancement. Each of the PLAINTIFFS requested, but were disallowed specific training necessary to advance,

---

[1] Hereafter the Department of Public Utilities may be referred to as "DPU". The Water Maintenance Division may be referred to as "Division".

including training on the hydrant & valve trucks. Ultimately, numerous less tenured white employees advanced through the ranks within the DIVISION and into management level positions, ultimately having responsibility over the PLAINTIFFS, because the training had been provided to them. Moreover, the PLAINTIFFS were treated less favorably than their white counterparts in the assignment of over-time. In fact, they have been forced to share the limited amount of over-time available with a Caucasian employee that does not work within the DIVISION.

Ultimately, the DEFENDANTS racial animus is reflected through its condoning of common racial slurs directed at the PLAINTIFFS, such as "nigger", "stupid niggers" and "shut up nigger", as well as racial jokes. Such highly derogatory language has been commonplace with the DIVISION among the Caucasian employees, both supervisory and hourly.

In March of 2011, the PLAINTIFFS collectively submitted an internal complaint alleging racial discrimination and harassment based in part on the afore-listed actions. In response, the DEFENDANTS Human Resources Department investigated their complaints, determining that racial slurs went unchecked within the Water Maintenance Division, disparate training measures were in place and the PLAINTIFFS were not being given the same opportunities to advance into supervisory positions.

Notwithstanding, the DEFENDANT failed to take appropriate steps to redress the past discriminatory practices and utterly failed to enact measures to ensure the PLAINTIFFS were not retaliated against for having made the internal complaint. Unfortunately, since their March 2011 complaint, each of the PLAINTIFFS has been subjected to a relentless pattern of retaliatory treatment, including disciplinary actions for imagined violations, such as standing to close to their vehicles and "insubordination", isolation, threats of physical harm and job loss.

## II.    JURISDICTION AND VENUE

2.    The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1331 as this action arises under the Constitution or laws of the United States, 28 U.S.C. § 1343 (a)(4) seeking to recover damages or to secure equitable or other relief under actions of Congress, specifically 42 U.S.C. 2000 and 42 U.S.C. §1981, which provide causes of action for the protection of Constitutional and civil rights, injunctive remedies, damages and reasonable attorney's fees.

3.    Venue is proper in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3), inasmuch as this judicial district lies in the location where the unlawful employment practices occurred. Venue is also proper in this Court pursuant to 28 U.S.C. §1391, in that the DEFENDANT RICHMOND maintains its offices, conducts business, and operates out of Richmond, Virginia and a substantial portion of the acts giving rise to the Complaint occurred in this judicial district.

## III.    PARTIES

4.    Plaintiff, MARCUS BRADLEY (hereafter individually referred to as "BRADLEY"), is an African American male and at all times mentioned herein a citizen of the United States and resident of Richmond, Virginia.    Plaintiff has been employed by the DEFENDANT since January 22, 2007 as a Pipefitter in the DIVISION.

5.    Plaintiff, JASON GOODSON (hereafter individually referred to as "GOODSON"), is an African American male and at all times mentioned herein a citizen of the United States and resident of Richmond, Virginia. Plaintiff has been employed by the DEFENDANT since February 1, 2009 as a Pipefitter in the DIVISION.

6.    Plaintiff, TORE HARRIS (hereafter individually referred to as "HARRIS"), is an African American male and at all times mentioned herein a citizen of the United States and

resident of Richmond, Virginia. Plaintiff has been employed by the DEFENDANT since December 10, 2007 as a Pipefitter in the DIVISION.

7.      Plaintiff, ERIC JOHNSON (hereafter individually referred to as "JOHNSON"), is an African American male and at all times mentioned herein a citizen of the United States and resident of North Chesterfield, Virginia. Plaintiff has been employed by the DEFENDANT since July 2, 2001 as a Pipefitter in the DIVISION.

8.      Plaintiff, ELWOOD MAYFIELD (hereafter individually referred to as "MAYFIELD"), is an African American male and at all times mentioned herein a citizen of the United States and resident of Richmond, Virginia. Plaintiff has been employed by the DEFENDANT since June 23, 2008 in the DIVISION.

9.      Plaintiff, GABRIEL POSEY (hereafter individually referred to as "POSEY"), is an African American male and at all times mentioned herein a citizen of the United States and resident of Richmond, Virginia. Plaintiff has been employed by the DEFENDANT since September 15, 2008 as a Pipefitter in the DIVISION.

10.     Plaintiff, LAWRENCE SMITH, JR. (hereafter individually referred to as "SMITH"), is an African American male and at all times mentioned herein a citizen of the United States and resident of Richmond, Virginia. Plaintiff has been employed by the DEFENDANT since November, 2007 in the DIVISION.

11.     Plaintiff, MILTON WILLIAMS (hereafter individually referred to as "WILLIAMS"), is an African American male and at all times mentioned herein a citizen of the United States and resident of Petersburg, Virginia. Plaintiff has been employed by the DEFENDANT since January 5, 2007 in the DIVISION.

12.     DEFENDANT CITY OF RICHMOND (hereafter referred to as "RICHMOND" or "DEFENDANT") is an incorporated city in Richmond, Virginia, and an employer conducing business in the State of Virginia.

### IV.     EXHAUSTION OF FEDERAL ADMINISTRATIVE REMEDIES

13.     On or about June 3, 2011, Plaintiff BRADLEY filed a Charge of Discrimination with the EEOC, which was ultimately referred to the Department of Justice.[2]

14.     Plaintiff BRADLEY was issued a Notice of Right to Sue by the Equal Employment Opportunity Commission on or about July 23, 2012. (Exhibit 1)

15.     On or about June 3, 2011. Plaintiff GOODSON filed a Charge of Discrimination with the EEOC, which was ultimately referred to the Department of Justice. [3]

16.     Plaintiff GOODSON was issued a Notice of Right to Sue by the Equal Employment Opportunity Commission on or about July 23, 2012. (Exhibit 2)

17.     On or about June 3, 2011, Plaintiff HARRIS filed a Charge of Discrimination with the EEOC, which was ultimately referred to the Department of Justice. [4]

18.     Plaintiff HARRIS was issued a Notice of Right to Sue by the Equal Employment Opportunity Commission on or about July 23, 2012. (Exhibit 3)

19.     On or about June 3, 2011, Plaintiff JOHNSON filed a Charge of Discrimination with the EEOC, which was ultimately referred to the Department of Justice.[5]

20.     Plaintiff JOHNSON was issued a Notice of Right to Sue by the Equal Employment Opportunity Commission on or about July 23, 2012. (Exhibit 4)

---

[2] Bradley amended his charge to include additional discriminatory acts and acts of retaliation on or about August 24, 2011 and September 21, 2011.

[3] Goodson amended his charge to include additional discriminatory acts and acts of retaliation on or about August 24, 2011 and September 21, 2011

[4] Harris amended his charge to include additional discriminatory acts and acts of retaliation on or about August 24, 2011 and September 21, 2011

[5] Johnson amended his charge to include additional discriminatory acts and acts of retaliation on or about August 24, 2011 and September 21, 2011

21.     On or about June 3, 2011, Plaintiff MAYFIELD filed a Charge of Discrimination with the EEOC, which was ultimately referred to the Department of Justice.[6]

22.     Plaintiff MAYFIELD was issued a Notice of Right to Sue by the Equal Employment Opportunity Commission on or about July 23, 2012. (Exhibit 5)

23.     On or about June 3, 2011, Plaintiff POSEY filed a Charge of Discrimination with the EEOC, which was ultimately referred to the Department of Justice.[7]

24.     Plaintiff POSEY was issued a Notice of Right to Sue by the Equal Employment Opportunity Commission on or about July 23, 2012. (Exhibit 6)

25.     On or about June 3, 2011, Plaintiff SMITH filed a Charge of Discrimination with the EEOC, which was ultimately referred to the Department of Justice.[8]

26.     Plaintiff SMITH was issued a Notice of Right to Sue by the Equal Employment Opportunity Commission on or about July 23, 2012. (Exhibit 7)

27.     On or about August 24, 2011, Plaintiff WILLIAMS filed a  Charge of Discrimination with the EEOC, which was ultimately referred to the Department of Justice.[9]

28.     Plaintiff WILLIAMS was issued a Notice of Right to Sue by the Equal Employment Opportunity Commission on or about July 23, 2012. (Exhibit 8)

29.     PLAINTIFFS have fulfilled all conditions precedent to the institution of this action under 42 U.S.C. §2000e-5 ("Title VII"), each having filed a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), each having

---

[6] Mayfield amended his charge to include additional discriminatory acts and acts of retaliation on or about August 24, 2011 and September 21, 2011

[7] Posey amended his charge to include additional discriminatory acts and acts of retaliation on or about August 24, 2011 and September 21, 2011

[8] Smith amended his charge to include additional discriminatory acts and acts of retaliation on or about August 24, 2011 and September 21, 2011

[9] Williams amended his charge to include additional discriminatory acts and acts of retaliation on or about August 24, 2011 and September 21, 2011

received a Right to Sue and initiating this cause of action within ninety days of receipt thereof. (See Exhibit 1 through 8)

## V.    STATEMENT OF FACTS

### A.    MARCUS BRADLEY

30.    BRADLEY is an African-American male employed since January 22, 2007 by the DEFENDANT CITY OF RICHMOND in the Department of Public Utilities- Water Maintenance Division as a Pipefitter.

31.    Throughout his employment, BRADLEY has been exposed to a hostile work environment based on his race, in that he was subjected to racial slurs, epithets and jokes, including, but not limited to, the following examples:

a.    In the Summer of 2010 BRADLEY, heard Boss Dolan, a Caucasian Crew Supervisor direct SMITH on the manner in which to perform work, stating to SMITH "I'm white and you're black, so you do what the hell I tell you!"

b.    In 2008 BRADLEY heard Caucasian General Supervisor Beverly Gillespie refer to WILLIAMS as "boy" and call him "buckwheat" after looking at WILLIAMS hair.

c.    In February of 2007, after complaining to General Supervisor Beverly Gillespie about a racial slur made by a co-worker, Gillespie told BRADLEY that he should come to his over and hang under a big oak tree where all the other black guys hang around. BRADLEY understood this remark as a referenced to hanging from a noose, intended to intimidate him from further racial complaints.

d.    Throughout BRADLEYS employment it has been commonplace, that his Caucasian so-workers and supervisors refer to BRADLEY and the other PLAINTIFFS by using racial slurs such as "NIGGER", "STUPID NIGGER", "SHUT UP NIGGER", and "BOY".

32.    BRADLEY complained to his supervisors about the slurs, jokes and demeaning statements. However, they failed to take appropriate responsive action. In fact, on many occasions because supervisors were involved, either witnessing the conduct or directly participating, it was understood throughout the Division that such conduct was condoned.

33.     After complaining, BRADLEY was subjected to racially motivated threats, intimidation and harassment, including but not limited to the constant threat of discharge or bodily harm.

34.     Additionally, tthroughout his employment, BRADLEY has also been exposed to disparate treatment due to his race through the DEFENDANTS enactment of a pattern and policy of disproportionate enforcement of policies, frustrating his opportunities for advancement and fundamentally altering the terms and conditions of BRADLEY'S employment.

35.     It has been DEFENDANTS policy, within the Department of Public Utilities-Water Maintenance that employees are placed within a skill-compensation range called the Broad Band Progress Program.  In the Program each employee is rated and placed in a Band between 1 and 5.  Band 1 is the lowest classification designed for probationary employees and employees with 1 year or less tenure, it requires the least amount of work related skills and is tied to the lowest compensation.  As the Band number increases, the requisite skill level and compensation increase.

36.     During BRADLEY'S employment with the DEFENDANT he was placed into the lowest pay range, rated as a Band 1 level employee, after five years of employment with the CITY OF RICHMOND, he remains a Band Level 1 employee.

37.     It is upon information and belief that the Caucasian employees hired into the Department of Public Utilities- Water Maintenance Division were either hired at higher Band levels, or  paid more than BRADLEY within the Band 1 pay scale, and have historically received higher wage increases throughout their employment than BRADLEY and the other PLAINTIFFS.

38.     Additionally, on numerous occasions less tenured Caucasian employees were provided with opportunities to advance upward within the Band levels, resulting in higher pay, through training provided on the backhoe, valve trucks, hydrant trucks and cranes. Such training is necessary to both obtain the skills necessary to move into the Band 2 through 5 levels, as well as to obtain promotions into supervision. The training is customarily provided to Caucasian employees and not African-American employees.

39.     Among those Caucasian employees having less tenure but receiving the identified training are Clinny Crochet, Brian Plank, Dave Thomas, Greg Walton, Bobby Masopost, Boss Dolen and Billy Overman.

40.     BRADLEY has been excluded from training on the backhoe, valve, crane and hydrant trucks, despite his numerous requests. Specifically, in 2009 BRADLEY along with the other PLAINTIFFS advised the General Supervisor, Beverly Gillespie that they wanted to obtain the afore-listed training. Mr. Gillespie directed them to sign up for the training with Management Analyst, Terrance Gray who allegedly was responsible for maintaining all training requests. Prior to 2009, BRADELY and the other PLAINTIFFS had requested this training from Mr. Gillespie, but had never been told that they needed to formally sign up for it.

41.     Regardless, even after "formally signing up", BRADLEY never received any training on the backhoe, valve, crane or hydrant trucks.

42.     Notably, soon after BRADLEY signed up for the training, Caucasian Greg Walton was assigned to train on the backhoe.

43.     Since 2009 when he formally "signed up" for the above-listed training, BRADLEY has verbally requested the same training on a number of occasions from Mr.

Gillespie and other members of management. BRADLEY was never given the requested training.

44. In addition to the disparate training opportunities, DEFENDANT has adopted an unwritten policy that African-American are not to advance into supervisory positions within in the Water Maintenance Division. It is upon information and belief, that over the past forty years only two African-Americans have held such supervisory positions.

45. On numerous occasions BRADLEY also advised his General Supervisor, Beverly Gillespie, that he wanted to advance into a supervisory position. BRADLEY was passed over and not selected to interview for any such position until on or about March 10, 2010.

46. At that time, the process for promotion into a supervisory position encompassed both a written test and interview with a panel of three management level employees.

47. While taking the written test portion, BRADLEY noted that many questions focused on knowledge acquired through the operation of the valve, hydrant, backhoe and crane, none of which he had been trained on. BRADLEY was placed in a distinct disadvantage when compared with his Caucasian counter-parts who had received such training, and thus had the necessary skills to do well on the test.

48. Moreover, during the March, 2010 interview, BRADLEY perceived that the two Caucasians on the panel, Beverly Gillespie and Emmitt Sandridge had already made their determination that he would **not** be the candidate selected for promotion.

49. Subsequent to the interview, BRADLEY contacted the only African-American on the panel, Wayne Lee, to ask him about the selection process and whether his suspicions were correct, that a Caucasian had been pre-selected for the supervisor's job. According to Mr. Lee, BRADLEY was correct. A decision had been made, even before the selection process began,

11

that a Caucasian would be getting the promotion. Even more revealing is Mr. Lee's admission that the Caucasian employee selected had been provided with the answers to the written portion of the supervisor's selection test to ensure he scored the highest.

50.     Soon thereafter, Caucasian Bobby Masopost, having less tenure and experience on the job than BRADLEY, was promoted into the supervisor's position.

51.     The previous occurrence was not an isolated incident. During BRADLEY'S tenure numerous Caucasian employees have been hired, and within less than one year been trained and promoted into supervisory positions, including, Clinny Crochet, Bobby Masopost, Brian Plank, Boss Dolen and Billy Overman.

52.     BRADLEY also became aware the PLAINTIFF JOHNSON has filed a formal grievance over such an incident on September 23, 2009, claiming that he had more tenure and experience than Clinny Crochet, a Caucasian, who had been moved into a supervisory position after only 90 days.   JOHNSON had claimed the entire application and interview process was flawed.     BRADLEY learned that despite an investigation occurring which revealed "inconsistencies" in the interview/selection process, Crochet was still promoted into the supervisors position, even though he had less experience and tenure than JOHNSON.

53.     During 2010 BRADLEY learned that PLAINTIFF GOODSON had assumed the position of "interim crew supervisor" while Emit Sandridge took a leave of absence and that after working thirteen days in the position, GOODSON had inquired whether he would be paid at the supervisory level consistent with Departmental policy which calls for the increased pay after fifteen days.   After General Supervisors Beverly Gillespie confirmed that the policy would be applicable, GOODSON was replaced by Wilford Sandridge, Caucasian, even though Sandridge was already supervising a different work crew.

54.    Additionally,   throughout his tenure, BRADLEY was advised that it was necessary to hold a CDL in order to qualify for advancement into a supervisory position.    In early January 2012 the DEFENDANT notified all employees within the Water Maintenance Division that in order to maintain their employment each had to possess a CDL.    Subsequently BRADLEY learned that several current Caucasian supervisors did not possess a CDL, including Wilford Sandridge, James Kelly and Billy Overman, again evidencing the intentional disparate treatment directed at African-American employees advancing into supervision.

55.    Notably, throughout his tenure, BRADLEY received yearly evaluations evidencing he more than met the DEFENDANTS job expectations.    Regardless, rather than provide the necessary training and allow BRADLEY to advance with the Water Maintenance Division, DEFENDANT re-hired a Caucasian,  Wilford Sandridge, who had been terminated by the DEFENDANT.

56.    Ultimately, during his tenure, BRADLEY wanted to advance within the Water Maintenance Division, both through increased Band Levels as well as through promotions into supervisory positions.  However, after requesting the necessary training on numerous occasions, to no avail; witnessing the treatment of the other PLAINTIFFS in their unsuccessful quests for advancement as well as his own; BRADLEY was fully aware of the unwritten policy within the Division that African-Americans were neither to be provided with the necessary training to move upward within the Band Levels or to be considered for advancement into supervision.    As a result, BRADLEY did not apply for any other open supervisory positions, as he knew he would not be considered.

57.    In addition, throughout his tenure, BRADLEY has been subjected to disparate treatment through the assignment of over-time and duty-time.    BRADLEY and the other

PLAINTIFFS have received less favorable days, including weekend and holiday assignments; and on average have received less scheduled over-time than their Caucasian counter-parts.

58.    Further, BRADLEY and the other PLAINTIFFS have had their over-time hours decreased so that the over-time hours can be given to Chris Modin, a Caucasian who does not even work within the Water Maintenance Division.

59.    Ultimately, the Department of Public Utilities-Water Maintenance Division has historically been segregated, with Caucasians holding all upper management positions. Those same managers enacted procedures that ensured African-Americans, including BRADLEY remain in the lowest paying positions with no opportunity to advance.    Upper management allows an atmosphere of racial intimidation through actively engaging in racial slurs, and threats and by refusing to take any remedial action when brought to their attention.    BRADLEY and the other PLAINTIFFS are commonly referred to as the "nigger-8s", the "crazy 8", and "the trouble makers", by their Caucasian co-workers, who have selected and identified one room within the Water Maintenance Division as the "Country Club". The Caucasian employees, both management and hourly, spend time there, and it is made very clear that the African-American employees are not welcome. BRADLEY has heard racial jokes and epithets coming from the room and has otherwise been excluded. Further, each of the PLAINTIFFS were photographed and their picture hung in the Water Maintenance office by their supervisor so they were easily identifiable by all management level personnel, resulting in further isolation and ostracization.

60.    BRADLEY has opposed these discriminatory practices on his own behalf and on behalf of other similarly situated minority employees on a number of occasions.    Including but not limited to on or about March 1, 2011 when BRADLEY submitted a complaint to DEFENDANT'S Human Resources Department identifying disparate treatment relative to

14

training opportunities, promotional opportunities, and the enforcement of internal policies; as well as racial harassment due to the continuous use of racial slurs and demeaning racial jokes.

61.     In response to his complaints, BRADLEY has been unfairly targeted, given disciplinary "write-ups" denied training and has been subjected to further harassment, intimidation, isolation, ostracism, and retribution, including threats that he will lose his job due to poor performance.

62.     Specifically, BRADLEY and the other PLAINTIFFS were required to attend a meeting on or about August 24, 2011 where they were advised that Michael Bellman, the Deputy Director of the Department of Public Utilities, and Melvin Lee, the Operations Manager, had determined that "effective immediately" there would be strict enforcement of the DEFENDANT'S dress code, attendance policy and employee conduct policies. At that time the PLAINTIFFS were also advised that if they did not increase their productivity their jobs would be outsourced to private contractors.

63.     BRADLEY interpreted these statements as a threat to his continued employment with DEFENDANT and a strategic measure intended to force BRADLEY to stop complaining about racial discrimination and harassment.

64.     BRADLEY and the other PLAINTIFFS filed a joint complaint of retaliation against Mr. Bellman and Mr. Lee for their conduct not only in the August 24th meeting, but also during subsequent meetings, where the PLAINTIFFS were denigrated by both men who screamed disrespectfully at them, and told them that they had no say in any job related matter, and that "they did not work in a democracy".

65.     During such a meeting, around November of 2011, Mr. Bellman began screaming at PLAINTIFF JOHNSON, in front of BRADLEY, telling him to "shut up" and threatening him

with insubordination when JOHNSON asserted that the PLAINTIFFS were being retaliated against with regard to the enforcement of policies against them, but not the Caucasians within the Division.

66.     Around December 19, 2011 the DEFENDANT generated a memorandum identifying the enforcement of certain "policies" within the Water Maintenance Division. The memorandum states that "Water Maintenance personnel will not loiter in the personnel vehicle parking area, or on employee vehicles parked in the parking area, during work hours."  It goes onto state "They are to do their work and if waiting for a supervisor, stand by the company vehicle or be with the supervisor."  It is upon information and belief that no Division within the Department of Public Works was affected by this memorandum, other than the Water Maintenance Division where all the PLAINTIFFS work.

67.     The December 19th memorandum intentionally targets BRADLEY and the other PLAINTIFFS in that they historically wait outside in the parking lot near the company vehicles for their supervisors who work inside completing paperwork or obtaining work assignments.

68.     BRADLEY is aware that other PLAINTIFFS have received disciplinary actions under these new policies as well as under old policies that are being strictly enforced against the PLAINTIFFS, but not Caucasian employees, and is fearful that he will be terminated if he continues to advocate against racial discrimination and racial harassment within the CITY OF RICHMOND.

**B.     JASON GOODSON**

69.     GOODSON is an African-American male employed since on or about February 1, 2009 by the DEFENDANT CITY OF RICHMOND in the Department of Public Utilities- Water Maintenance as a Pipefitter.

70. Throughout his employment, GOODSON has been exposed to a hostile work environment based on his race, in that he was subjected to racial slurs, epithets and jokes by his co-workers and supervisors, who either participated or failed to take prompt remedial action to cease the ongoing racial harassment, including, but not limited to, the following examples:

a. On or about February 1, 2009, GOODSON was assigned to work with Caucasians, Emit Sandridge, and Greg Walton as well as PLAINTIFFS HARRIS and POSEY. Sandridge, who was the assigned crew supervisor, along with Walton called GOODSON a "gorilla" and "animal". GOODSON overheard both Sandridge and Walton refer to HARRIS as "pussy" and POSEY as a "queer from Texas".

b. On or about February 2, 2009 GOODSON complained to General Supervisor, Beverly Gillespie, a Caucasian, about the things said by Sandridge and Walton. Gillespie advised GOODSON "not to take things so seriously", and suggested he "should come and *hang* out under the tree at his house, where all the other black guys hung." BRADLEY understood this remark as a referenced to hanging from a noose, intended to intimidate him from further racial complaints.

c. Around April, 2009 two work crews were combined, one headed by supervisor Emit Sandridge, the other by supervisor Wilford Sandridge, the racial slurs and jokes increased to a daily basis. Wilford Sandridge would commonly remark about GOODSON'S physical size, asking him question such as whether he had a "big black penis", he would touch his arms and legs and comment about GOODSON being "strong like a gorilla". Sandridge also frequently stated "you niggers are all the same, you like a lot of women and loud music". GOODSON complained that his racial jokes and comments were not funny and made him feel uneasy, asking Sandridge to stop. The harassment did not stop. GOODSON witnessed Sandridge make similar remarks to HARRIS and POSEY, who were also assigned to the crew.

d. During the Summer of 2010 Caucasian Greg Walton called GOODSON, HARRIS and POSEY "stupid niggers" and told them to "shut up" while at a job site.

e. During the Winter of 2010 while driving in a work truck Caucasian supervisor stated to GOODSON "niggers are always fucking things up." GOODSON turned to see what he was talking about and saw an African-American driving a car with rims on it.

f. Throughout GOODSON'S employment numerous racial slurs have been directed at him and other African-American co-workers, including "NIGGER", "STUPID

NIGGER", "SHUT UP NIGGER", and "BOY", by his Caucasian co-workers and supervisors.

71.     GOODSON complained to his supervisors about the slurs, jokes and demeaning statements.  However, they failed to take appropriate responsive action.  In fact, on many occasions because supervisors were involved, either witnessing the conduct or directly participating, it was understood throughout the Division that such conduct was condoned.

72.     After complaining GOODSON was subjected to racially motivated threats, intimidation and harassment, including but not limited to the constant threat of discharge or bodily harm.

73.     Additionally tthroughout his employment, GOODSON has also been exposed to disparate treatment due to his race by the DEFENDANT through its enactment of a pattern and policy of disproportionate enforcement of policies, frustrating his opportunities for advancement and fundamentally altering the terms and conditions of GOODSON'S employment.

74.     According to DEFENDANT'S policy, Department of Public Utilities- Water Maintenance employees are to be placed within a skill-compensation based range called Broad Band Progress Program.     Each employee is rated and placed in a Band between 1 and 5.  Band 1 is identified as a range for probationary employees and employees with 1 year or less tenure and requires the least amount of work related skills.

75.     During GOODSON'S employment with the DEFENDANT he was placed into the lowest pay range, rated as a Band 1 level employee, where he currently remains, after three years of employment with the CITY OF RICHMOND.

76.     It is upon information and belief that the Caucasian employees hired into the Department of Public Utilities- Water Maintenance Division were hired at higher Band levels, or paid more than GOODSON within the Band 1 pay scale and have historically benefited from

higher wage increases throughout their employment than GOODSON and the other PLAINTIFFS.

77.     Additionally, on numerous occasions less tenured Caucasian employees were provided with opportunities to advance upward within the Band levels, resulting in higher pay, through training provided on the backhoe, valve trucks, hydrant trucks and cranes. Such training is necessary to both obtain the skills necessary to move into the Band 2 through 5 levels, as well as to obtain promotions into supervision.     The training is customarily provided to Caucasian employees and not African-American employees.

78.     Among those Caucasian employees having less tenure but receiving the identified training are Clinny Crochet, Brian Plank, Dave Thomas, Greg Walton, Bobby Masopost, Boss Dolen and Billy Overman.

79.     GOODSON has been excluded from training on the backhoe, valve, crane and hydrant trucks, despite his numerous requests. Specifically, in 2009 GOODSON along with the other PLAINTIFFS advised the General Supervisor, Beverly Gillespie that they wanted to obtain the afore-listed training.     Mr. Gillespie directed them to sign up for the training with Management Analyst, Terrance Gray who allegedly was responsible for maintaining all training requests.     Prior to 2009, GOODSON and the other PLAINTIFFS had requested this training from Mr. Gillespie, but had never been told that they needed to formally sign up for it.

80.     Regardless, even after "formally signing up", GOODSON never received any training on the backhoe, valve, crane or hydrant trucks.

81.     However, soon after GOODSON signed up for the training, Caucasian Greg Walton was assigned to train on the backhoe.

82. Also in 2009 GOODSON heard PLAINTIFF WILLIAMS ask Beverly Williams to place him on the Valve Truck so he could be trained on it, like their Caucasian counter-parts, including Gillespie's son-in law Boss Dolen. Gillespie, who was reading a newspaper, simply looked up, made eye contact, said a resounding "NO", then went back to his paper.

83. Since 2009, GOODSON has verbally requested training on the backhoe, crane, valve and hydrant trucks on a number of occasions from Mr. Gillespie and other members of management. GOODSON was never given the requested training.

84. In addition to the disparate training opportunities, DEFENDANT has adopted an unwritten policy that African-American are not to advance into supervisory positions within in the Water Maintenance Division. It is upon information and belief, that over the past forty years only two African-Americans have held such supervisory positions.

85. In mid March of 2010, GOODSON became aware the PLAINTIFF BRADLEY had applied for a supervisory position and had been selected to undergo the interviewing process. GOODSON learned that the process encompassed both a written test and interview with a panel of three management level employees and that the written test portion included numerous questions requiring knowledge acquired through the operation of the valve, hydrant, backhoe and crane, none of which GOODSON and the other PLAINTIFFS had been trained on. GOODSON formed the belief that due to his lack of training he was placed in a distinct disadvantage when compared with his Caucasian counter-parts who had received such training, and thus had the necessary skills to do better on the supervisors test.

86. GOODSON also became aware that the entire supervisor selection process was simply a façade, in that the Caucasian managers had already pre-determined what Caucasian

employee would get the promotion, going so far as to provide the pre-determined candidate with the test answers.

87.     Soon after the interviewing process was completed, Caucasian Bobby Masopost, who had less tenure and experience on the job than PLAINTIFF BRADLEY, was promoted into the supervisor's position.

88.     The previous occurrences were not isolated incidents.  During GOODSON'S tenure, numerous Caucasian employees have been hired, and within less than one year been trained and promoted into supervisory positions, including, Clinny Crochet, Bobby Masopost, Brian Plank, Boss Dolen and Billy Overman.

89.     GOODSON also became aware the PLAINTIFF JOHNSON has filed a formal grievance over such an incident on September 23, 2009, claiming that he had more tenure and experience than Clinny Crochet, a Caucasian, who had been moved into a supervisory position after only 90 days.   JOHNSON had claimed the entire application and interview process was flawed.   GOODSON learned that despite an investigation occurring which revealed "inconsistencies" in the interview/selection process, Crochet was still promoted into the supervisors position, even though he had less experience and tenure than JOHNSON.

90.     During 2010  GOODSON assumed the position of "interim crew supervisor" while Emit Sandridge took a leave of absence.  After working thirteen days in the position, GOODSON inquired whether he would be paid at the supervisory level consistent with Departmental policy which calls for the increased pay after fifteen days.   General Supervisors Beverly Gillespie confirmed that the policy would be applicable.   The following day, GOODSON was replaced by Wilford Sandridge, Caucasian, even though Sandridge was already supervising a different work crew.

91.    Additionally, throughout his tenure, GOODSON has been advised that he will not qualify for advancement into a supervisory position until he obtains his Commercial Driver's License (hereafter "CDL). GOODSON has requested the requisite training in order to obtain his CDL, the most recent occurring on or about January, 2012. GOODSON has been denied the training, which historically has been provided to Caucasian employees within the Water Maintenance Division.

92.    Notably, current supervisors including Wilford Sandridge, James Kelly and Billy Overman did not possess a CDL at the time they were promoted into supervision, and it is upon information and belief that they still do not possess a CDL.

93.    Throughout his tenure, GOODSON received yearly evaluations evidencing he more than met the DEFENDANTS job expectations.    Regardless, rather than provide the necessary training and allow GOODSON to advance with the Water Maintenance Division, DEFENDANT re-hired a Caucasian, Wilford Sandridge, who had been terminated by the DEFENDANT.

94.    Ultimately, during his tenure, GOODSON wanted to advance within the Water Maintenance Division, both through increased Band Levels as well as through promotions into supervisory positions. However, after requesting the necessary training on numerous occasions, to no avail; witnessing the treatment of the other PLAINTIFFS in their unsuccessful quests for advancement as well as his own; GOODSON was fully aware of the unwritten policy within the Division that African-Americans were neither to be provided with the necessary training to move upward within the Band Levels or to be considered for advancement into supervision. As a result, GOODSON did not apply for any other open supervisory positions, as he knew he would not be considered.

95.     In addition, throughout his tenure, GOODSON has been subjected to disparate treatment through the assignment of over-time and duty-time. GOODSON and the other PLAINTIFFS have received less favorable days, including weekend and holiday assignments; and on average have received less scheduled over-time than their Caucasian counter-parts.

96.     Further, GOODSON and the other PLAINTIFFS have had their over-time hours decreased so that the over-time hours can be given to Chris Modin, a Caucasian who does not even work within the Water Maintenance Division.

97.     Ultimately, the Department of Public Utilities-Water Maintenance Division has historically been segregated, with Caucasians holding all upper management positions. Those same managers enacted procedures that ensured African-Americans, including GOODSON remained in the lowest paying positions with no opportunity to advance. Upper management allows an atmosphere of racial intimidation through actively engaging in racial slurs, and threats and by refusing to take any remedial action when brought to their attention. GOODSON and the other PLAINTIFFS are commonly referred to as the "nigger-8s", the "crazy 8", and "the trouble makers", by their Caucasian co-workers, who have selected and identified one room within the Water Maintenance Division as the "Country Club". The Caucasian employees, both management and hourly, spend time there, and it is made very clear that the African-American employees are not welcome. GOODSON has heard racial jokes and epithets coming from the room and has otherwise been excluded. Further, each of the PLAINTIFFS were photographed and their picture hung in the Water Maintenance office by their supervisor so they were easily identifiable by all management level personnel, resulting in further isolation and ostracization.

98.     GOODSON has opposed these discriminatory practices on his own behalf and on behalf of other similarly situated minority employees on a number of occasions.   Including but

not limited to on or about March 1, 2011 when GOODSON submitted a complaint to DEFENDANT'S Human Resources Department identifying disparate treatment relative to training opportunities, promotional opportunities, and the enforcement of internal policies; as well as racial harassment due to the continuous use of racial slurs and demeaning racial jokes.

99.     In response to his complaints, GOODSON has been unfairly targeted, given disciplinary "write-ups", denied training and has been subjected to further harassment, intimidation, isolation, ostracism and retribution, including threats that he will lose his job due to poor performance all in retaliation for having opposed racial discrimination.

100.    Specifically, GOODSON and the other PLAINTIFFS were required to attend a meeting on or about August 24, 2011 where they were advised that Michael Bellman, the Deputy Director of the Department of Public Utilities, and Melvin Lee, the Operations Manager, had determined that "effective immediately" there would be strict enforcement of the DEFENDANTS dress code, attendance policy and employee conduct policies.  At that time the PLAINTIFFS were also advised that if they did not increase their productivity their jobs would be outsourced to private contractors.

101.    GOODSON interpreted these statements as a threat to his continued employment and a strategic measure intended to force GOODSON to stop complaining about racial discrimination and harassment.

102.    GOODSON and the other PLAINTIFFS filed a joint complaint of retaliation against Mr. Bellman and Mr. Lee for their conduct not only in the August 24th meeting, but also during subsequent meetings where the PLAINTIFFS were denigrated by both men who screamed disrespectfully at them, and told them that they had no say in any job related matter, and that "they did not work in a democracy".

103.    During such a meeting, around November of 2011, Mr. Bellman began screaming at PLAINTIFF JOHNSON, in front of GOODSON, telling him to "shut up" and threatening him with insubordination when JOHNSON asserted that the PLAINTIFFS were being retaliated against with regard to the enforcement of policies against them, but not the Caucasians within the DIVISION.

104.    Around December 19, 2011 the DEFENDANT generated a memorandum identifying the enforcement of certain "policies" within the Water Maintenance Division. The memorandum states that "Water Maintenance personnel will not loiter in the personnel vehicle parking area, or on employee vehicles parked in the parking area, during work hours." It goes onto state "They are to do their work and if waiting for a supervisor, stand by the company vehicle or be with the supervisor." It is upon information and belief that no Division within the Department of Public Works was affected by this memorandum, other than the Water Maintenance Division where all the PLAINTIFFS work.

105.    The December 19th memorandum intentionally targets GOODSON and the other PLAINTIFFS in that they historically wait outside in the parking lot near the company vehicles for their supervisors who work inside completing paperwork or obtaining work assignments.

106.    Since the issuance of the December 19th memorandum, GOODSON has been written up for "loitering" simply for standing in the parking lot area waiting for his supervisors.

107.    Additionally, GOODSON has been written up for not wearing his "work boots" during an inside meeting.

108.    GOODSON is aware that other PLAINTIFFS have received disciplinary actions under these new policies as well as under old policies that are being strictly enforced against the PLAINTIFFS, but not Caucasian employees, and is fearful that he will be terminated if he

continues to advocate against racial discrimination and racial harassment within the CITY OF RICHMOND.

109. In fact, prior to opposing the ongoing racial discrimination and harassment, GOODSON had received no disciplinary actions related to his work performance.

110. Around January, 2012 GOODSON and the other PLAINTIFFS were advised that anyone not in possession of a CDL faced termination. Since GOODSON had previously requested such training from within the Water Maintenance DIVISION, but been denied, he interpreted this new "requirement" as yet another threat and act of retaliation for having complained about the ongoing racial discrimination and harassment.

## C. TORE HARRIS

111. HARRIS is an African-American male employed since December 10, 2007 by the DEFENDANT CITY OF RICHMOND in the Department of Public Utilities- Water Maintenance as a Pipefitter.

112. Throughout his employment, HARRIS has been exposed to a hostile work environment based on his race, in that he was subjected to racial slurs, epithets and jokes including, but not limited to, the following:

    a. On or about February 1, 2009, HARRIS was assigned to work with Caucasians, Emitt Sandridge, and Greg Walton as well as PLAINTIFFS GOODSON and POSEY. Sandridge, who was the assigned crew supervisor, along with Walton called HARRIS such names as "pussy". HARRIS overhead both Sandridge and Walton refer to GOODSON as a "gorilla" and "animal" and POSEY as a "queer from Texas".

    b. Around April, 2009 two work crews were combined, one headed by supervisor Emit Sandridge, the other by supervisor Wilford Sandridge, the racial slurs and jokes increased to a daily basis. HARRIS witnessed racial harassment directed toward GOODSON by Wilford Sandridge who would commonly remark about GOODSON'S physical size, asking him question such as whether he had a "big black penis", he would touch his arms and legs and comment about

GOODSON being "strong like a gorilla". Sandridge also frequently stated out loud "you niggers are all the same, you like a lot of women and loud music".

c.  HARRIS experienced similar racial remarks concerning his body size, and physical touching by Sandridge and Warren Proffitt who touched his buttocks, penis, arms and legs, HARRIS was also called a "Faggot" by Sandridge. HARRIS complained that his racial jokes and comments and the demeaning manner in which he was being treated, asking Sandridge and Proffit to stop. The harassment did not stop.

d.  In fact, he complained to General Supervisor Beverly Gillespie about the harassment, however rather than intervening to stop it, Gillespie implemented a policy requiring HARRIS to give him a kiss on his cheek in order to receive his paycheck. HARRIS formed the opinion that Gillespie's conduct was intended to humiliate and demean him for having complained; as well as to teach HARRIS to succumb to the harassment or face even more demeaning treatment by his Caucasian co-workers.

e.  During the Summer of 2010 Caucasian Greg Walton called GOODSON, HARRIS and POSEY "stupid niggers" and told them to "shut up" while at a job site. Walton admitted saying "Shut up Nigger" to HARRIS.

f.  On September 19, 2011 HARRIS overheard Caucasian co-worker Billy Purdy, Jr. call PLAINTIFF WILLIAMS "boy" and "nigger" in a very derogatory demeaning way. Caucasian Supervisors Mike Falkenstein and Curtis Cambel witnessed the encounter but did not intervene.

g.  Warren Proffit, Caucasian called HARRIS a "Porch monkey"

h.  Throughout HARRIS'S employment numerous racial slurs have been directed at him and other African-American co-workers, including "NIGGER", "STUPID NIGGER", "SHUT UP NIGGER", and "BOY", by his Caucasian co-workers and supervisors.

113.  HARRIS complained to his supervisors about the slurs, jokes and demeaning statements. However, they failed to take appropriate responsive action. In fact, on many occasions because supervisors were involved, either witnessing the conduct or directly participating, it was understood throughout the Division that such conduct was condoned.

114. After complaining HARRIS was subjected to racially motivated threats, intimidation and harassment, including but not limited to the constant threat of discharge or bodily harm.

115. Throughout his employment, HARRIS has also been exposed to disparate treatment due to his race by the DEFENDANT through its enactment of a pattern and policy of disproportionate enforcement of policies, frustrating his opportunities for advancement and fundamentally altering the terms and conditions of HARRIS'S employment.

116. According to DEFENDANT'S policy, Department of Public Utilities- Water Maintenance employees are to be placed within a skill-compensation based range called Broad Band Progress Program. Each employee is rated and placed in a Band between 1 and 5. Band 1 is identified as a range for probationary employees and employees with 1 year or less tenure and requires the least amount of work related skills.

117. During HARRIS'S employment with the DEFENDANT he was placed into the lowest pay range, rated as a Band 1 level employee, where he currently remains, after four years of employment with the City or Richmond.

118. It is upon information and belief that the Caucasian employees hired into the Department of Public Utilities- Water Maintenance Division were hired at higher Band levels, or paid more than HARRIS within the Band 1 pay scale and have historically benefited from higher wage increases throughout their employment than HARRIS and the other PLAINTIFFS.

119. Additionally, on numerous occasions less tenured Caucasian employees were provided with opportunities to advance upward within the Band levels, resulting in higher pay, through training provided on the backhoe, valve trucks, hydrant trucks and cranes. Such training is necessary to both obtain the skills necessary to move into the Band 2 through 5 levels, as well

as to obtain promotions into supervision. The training is customarily provided to Caucasian employees and not African-American employees.

120. Among those Caucasian employees having less tenure but receiving the identified training are Clinny Crochet, Brian Plank, Dave Thomas, Greg Walton, Bobby Masopost, Boss Dolen and Billy Overman.

121. HARRIS has been excluded from training on the backhoe, valve, crane and hydrant trucks, despite his numerous requests. Specifically, in 2009 HARRIS along with the other PLAINTIFFS advised the General Supervisor, Beverly Gillespie that they wanted to obtain the afore-listed training. Mr. Gillespie directed them to sign up for the training with Management Analyst, Terrance Gray who allegedly was responsible for maintaining all training requests. Prior to 2009, HARRIS and the other PLAINTIFFS had requested this training from Mr. Gillespie, but had never been told that they needed to formally sign up for it.

122. Regardless, even after "formally signing up", HARRIS never received any training on the backhoe, valve, crane or hydrant trucks.

123. Notably, soon after HARRIS signed up for the training, Caucasian Greg Walton was assigned to train on the backhoe.

124. Since 2009, HARRIS has verbally requested training on the backhoe, crane, valve and hydrant trucks on a number of occasions from Mr. Gillespie and other members of management. HARRIS was never given the requested training.

125. In addition to the disparate training opportunities, DEFENDANT has adopted an unwritten policy that African-American are not to advance into supervisory positions within in the Water Maintenance Division. It is upon information and belief, that over the past forty years only two African-Americans have held such supervisory positions.

126.    In mid March of 2010, HARRIS became aware the PLAINTIFF BRADLEY had applied for a supervisory position and had been selected to undergo the interviewing process. HARRIS learned that the process encompassed both a written test and interview with a panel of three management level employees and that the written test portion included numerous questions requiring knowledge acquired through the operation of the valve, hydrant, backhoe and crane, none of which HARRIS and the other PLAINTIFFS had been trained on. HARRIS formed the belief that due to his lack of training he was placed in a distinct disadvantage when compared with his Caucasian counter-parts who had received such training, and thus had the necessary skills to do better on the supervisors test.

127.    HARRIS also became aware that the entire supervisor selection process was simply a façade, in that the Caucasian managers had already pre-determined what Caucasian employee would get the promotion, going so far as to provide the pre-determined candidate with the test answers.

128.    Soon after the interviewing process was completed, Caucasian Bobby Masopost, who had less tenure and experience on the job than PLAINTIFF BRADLEY, was promoted into the supervisor's position.

129.    The previous occurrence was not an isolated incident. During HARRIS'S tenure, numerous Caucasian employees have been hired, and within less than one year been trained and promoted into supervisory positions, including, Clinny Crochet, Bobby Masopost, Brian Plank, Boss Dolen and Billy Overman.

130.    In 2010 HARRIS learned that PLAINTIFF GOODSON had assumed the position of "interim crew supervisor" while Emit Sandridge took a leave of absence and that after working thirteen days in the position, GOODSON had inquired whether he would be paid at the

supervisory level consistent with Departmental policy which calls for the increased pay after fifteen days. After General Supervisors Beverly Gillespie confirmed that the policy would be applicable, GOODSON was replaced by Wilford Sandridge, Caucasian, even though Sandridge was already supervising a different work crew.

131.    HARRIS also became aware the PLAINTIFF JOHNSON has filed a formal grievance over such an incident on September 23, 2009, claiming that he had more tenure and experience than Clinny Crochet, a Caucasian, who had been moved into a supervisory position after only 90 days. JOHNSON had claimed the entire application and interview process was flawed. HARRIS learned that despite an investigation occurring which revealed "inconsistencies" in the interview/selection process, Crochet was still promoted into the supervisors position, even though he had less experience and tenure than JOHNSON.

132.    Additionally, throughout his tenure, HARRIS was advised that it was necessary to hold a CDL in order to qualify for advancement into a supervisory position. In early January 2012 the DEFENDANT notified all employees within the Water Maintenance Division that in order to maintain their employment each had to possess a CDL. After which HARRIS learned that several current Caucasian supervisors did not possess a CDL, including Wilford Sandridge, James Kelly and Billy Overman, again evidencing the intentional disparate treatment directed at African-American employees.

133.    Notably, throughout his tenure, HARRIS received yearly evaluations evidencing he more than met the DEFENDANTS job expectations. Regardless, rather than provide the necessary training and allow HARRIS to advance with the Water Maintenance DIVISION, DEFENDANT re-hired a Caucasian, Wilford Sandridge, who had been terminated by the DEFENDANT.

134. Ultimately, during his tenure, HARRIS wanted to advance within the Water Maintenance Division, both through increased Band Levels as well as through promotions into supervisory positions. However, after requesting the necessary training on numerous occasions, to no avail; witnessing the treatment of the other PLAINTIFFS in their unsuccessful quests for advancement as well as his own; HARRIS was fully aware of the unwritten policy within the Division that African-Americans were neither to be provided with the necessary training to move upward within the Band Levels or to be considered for advancement into supervision. As a result, HARRIS did not apply for any open supervisory positions as he knew he would not be considered.

135. In addition, throughout his tenure, HARRIS has been subjected to disparate treatment through the assignment of over-time and duty-time. HARRIS and the other PLAINTIFFS have received less favorable days, including weekend and holiday assignments; and on average have received less scheduled over-time than their Caucasian counter-parts.

136. Further, HARRIS and the other PLAINTIFFS have had their over-time hours decreased so that the over-time hours can be given to Chris Modin, a Caucasian who does not even work within the Water Maintenance Division.

137. Ultimately, the Department of Public Utilities-Water Maintenance Division has historically been segregated, with Caucasians holding all upper management positions. Those same managers enacted procedures that ensured African-Americans, including HARRIS remained in the lowest paying positions with no opportunity to advance. Upper management allows an atmosphere of racial intimidation through actively engaging in racial slurs, and threats and by refusing to take any remedial action when brought to their attention. HARRIS and the other PLAINTIFFS are commonly referred to as the "nigger-8s", the "crazy 8", and "the trouble

makers", by their Caucasian co-workers, who have selected and identified one room within the Water Maintenance Division as the "Country Club". The Caucasian employees, both management and hourly, spend time there, and it is made very clear that the African-American employees are not welcome. HARRIS has heard racial jokes and epithets coming from the room and has otherwise been excluded. Further, each of the PLAINTIFFS were photographed and their picture hung in the Water Maintenance office by their supervisor so they were easily identifiable by all management level personnel, resulting in further isolation and ostracization.

138.    HARRIS has opposed these discriminatory practices on his own behalf and on behalf of other similarly situated minority employees on a number of occasions. Including but not limited to on or about March 1, 2011 when HARRIS submitted a complaint to DEFENDANT'S Human Resources Department identifying disparate treatment relative to training opportunities, promotional opportunities, and the enforcement of internal policies; as well as racial harassment due to the continuous use of racial slurs and demeaning racial jokes.

139.    In response to his complaints, HARRIS has been unfairly targeted, given disciplinary "write-ups", denied training and has been subjected to further harassment, intimidation, isolation, ostracism and retribution, including threats that he will lose his job due to poor performance all in retaliation for having opposed racial discrimination.

140.    Specifically, HARRIS and the other PLAINTIFFS were required to attend a meeting on or about August 24, 2011 where they were advised that Michael Bellman, the Deputy Director of the Department of Public Utilities, and Melvin Lee, the Operations Manager, had determined that "effective immediately" there would be strict enforcement of the DEFENDANTS dress code, attendance policy and employee conduct policies. At that time the

PLAINTIFFS were also advised that if they did not increase their productivity their jobs would be outsourced to private contractors.

141.    HARRIS interpreted these statements as a threat to his continued employment with DEFENDANT and a strategic measure intended to force HARRIS to stop complaining about racial discrimination and harassment.

142.    HARRIS and the other PLAINTIFFS filed a joint complaint of retaliation against Mr. Bellman and Mr. Lee for their conduct not only in the August 24th meeting, but also during subsequent meetings, where the PLAINTIFFS were denigrated by both men who screamed disrespectfully at them, and told them that they had no say in any job related matter, and that "they did not work in a democracy".

143.    During such a meeting, around November of 2011 Mr. Bellman began screaming at PLAINTIFF JOHNSON, in front of HARRIS, telling him to "shut up" and threatening him with insubordination when JOHNSON asserted that the PLAINTIFFS were being retaliated against with regard to the enforcement of policies against them, but not the Caucasians within the Division.

144.    Around December 19, 2011 the DEFENDANT generated a memorandum identifying the enforcement of certain "policies" within the Water Maintenance Division. The memorandum states that "Water Maintenance personnel will not loiter in the personnel vehicle parking area, or on employee vehicles parked in the parking area, during work hours." It goes onto state "They are to do their work and if waiting for a supervisor, stand by the company vehicle or be with the supervisor." It is upon information and belief that no Division within the Department of Public Works was affected by this memorandum, other than the Water Maintenance Division where all the PLAINTIFFS work.

145. The December 19th memorandum intentionally targets HARRIS and the other PLAINTIFFS in that they historically wait outside in the parking lot near the company vehicles for their supervisors who work inside completing paperwork or obtaining work assignments.

146. Since the issuance of the December 19th memorandum, HARRIS has been threatened with being written up for "loitering" simply for standing in the parking lot area waiting for his supervisor to arrive.

147. HARRIS is aware that other PLAINTIFFS have received disciplinary actions under these new policies as well as under old policies that are being strictly enforced against the PLAINTIFFS, but not Caucasian employees, and is fearful that he will be terminated if he continues to advocate against racial discrimination and racial harassment within the CITY OF RICHMOND.

148. Further, HARRIS is forced to endure sarcastic comments from co-workers and supervisors, including Wilford Sandridge, about being sued by HARRIS for any little thing they may say or do.

**D.    ERIC JOHNSON**

149. JOHNSON is an African-American male employed since July 2, 2001 by the DEFENDANT CITY OF RICHMOND in the Department of Public Utilities. He worked in the Water Maintenance Division as a Pipefitter 1 through January 23, 2012, when he was moved into the "Acting" Supervisor position until March of 2012 while Emmitt Sandridge, the permanent Supervisor was on medical leave.

150. Throughout his employment, JOHNSON has been exposed to a hostile work environment based on his race, in that he was subjected to racial slurs, epithets and jokes including, but not limited to, the following:

a.  Throughout JOHNSON'S employment numerous racial slurs have been directed at him and other African-American co-workers, including "NIGGER", "STUPID NIGGER", "SHUT UP NIGGER", and "BOY", by his Caucasian co-workers and supervisors.

151.  JOHNSON complained to his supervisors about the slurs, jokes and demeaning statements. However, they failed to take appropriate responsive action. In fact, on many occasions because supervisors were involved, either witnessing the conduct or directly participating, it was understood throughout the Division that such conduct was condoned.

152.  After complaining JOHNSON was subjected to racially motivated threats, intimidation and harassment, including but not limited to the constant threat of discharge or bodily harm.

153.  Throughout his employment, JOHNSON has also been exposed to disparate treatment due to his race by the DEFENDANT through its enactment of a pattern and policy of disproportionate enforcement of policies, frustrating his opportunities for advancement and fundamentally altering the terms and conditions of JOHNSON'S employment.

154.  According to DEFENDANT'S current policy, Department of Public Utilities-Water Maintenance employees are to be placed within a skill-compensation based range called Broad Band Progress Program. Each employee is rated and placed in a Band between 1 and 5. Band 1 is identified as a range for probationary employees and employees with 1 year or less tenure and requires the least amount of work related skills.

155.  JOHNSON is very familiar with the Broad Band Progress Program as he was on the panel that provided input as to the skills assigned to each level.

156.  JOHNSON and the other employees within the Water Maintenance Division were to be evaluated based on their experience and skill level and placed within a Band ranging from 1 to 5.

157. During JOHNSON'S employment with the DEFENDANT he was placed into the lowest pay range, rated as a Band 1 level employee, where he remained throughout his eleven year tenure. With the exception of being moved into the interim Acting Supervisor position for the limited time period of January 23, 2012 through March of 2012, while the permanent Supervisor is on medical leave.

158. It is upon information and belief that the Caucasian employees hired into the Department of Public Utilities- Water Maintenance Division were hired at higher Band levels, or paid more than JOHNSON within the pay scale and have historically benefited from higher wage increases throughout their employment than JOHNSON and the other PLAINTIFFS.

159. Additionally, on numerous occasions less tenured Caucasian employees were provided with opportunities to advance upward within the Band levels, resulting in higher pay, through training provided on the backhoe, valve trucks, hydrant trucks and cranes. Such training is necessary to both obtain the skills necessary to move into the Band 2 through 5 levels, as well as to obtain promotions into supervision. The training is customarily provided to Caucasian employees and not African-American employees.

160. Among those Caucasian employees having less tenure but receiving the identified training are Clinny Crochet, Brian Plank, Dave Thomas, Greg Walton, Bobby Masopost, Boss Dolen and Billy Overman.

161. Despite his numerous requests, JOHNSON has been excluded from training on the backhoe, valve, crane and hydrant trucks. Specifically, in 2009 JOHNSON along with the other PLAINTIFFS advised the General Supervisor, Beverly Gillespie that they wanted to obtain the afore-listed training. Mr. Gillespie directed them to sign up for the training with Management Analyst, Terrance Gray who allegedly was responsible for maintaining all training

requests. Prior to 2009, JOHNSON and the other PLAINTIFFS had requested this training from Mr. Gillespie, but had never been told that they needed to formally sign up for it.

162. Regardless, even after "formally signing up", JOHNSON received no training on the backhoe, valve, crane and hydrant trucks.

163. Notably, soon after JOHNSON signed up for the training in 2009, Caucasian Greg Walton was assigned to train on the backhoe.

164. Since 2009, JOHNSON has verbally requested training on the backhoe, crane, valve and hydrant trucks on a number of occasions from Mr. Gillespie and other members of management. JOHNSON was given only limited training, and was not considered for advancement within the Band Level or into Supervision, at least not until January, 2012, eleven years after being hired.

165. In addition to the disparate training opportunities, DEFENDANT has adopted an unwritten policy that African-American are not to advance into supervisory positions within in the Water Maintenance Division. It is upon information and belief, that over the past forty years only two African-Americans have held such supervisory positions.

166. In mid March of 2010, JOHNSON became aware the PLAINTIFF BRADLEY had applied for a supervisory position and had been selected to undergo the interviewing process. JOHNSON learned that the process encompassed both a written test and interview with a panel of three management level employees and that the written test portion included numerous questions requiring knowledge acquired through the operation of the valve, hydrant, backhoe and crane, none of which JOHNSON and the other PLAINTIFFS had been trained on. JOHNSON formed the belief that due to his lack of training he was placed in a distinct disadvantage when

compared with his Caucasian counter-parts who had received such training, and thus had the necessary skills to do better on the supervisors test.

167. JOHNSON also became aware that the entire supervisor selection process was simply a façade, in that the Caucasian managers had already pre-determined what Caucasian employee would get the promotion, going so far as to provide the pre-determined candidate with the test answers.

168. Soon after the interviewing process was completed, Caucasian Bobby Masopost, who had less tenure and experience on the job than PLAINTIFF BRADLEY, was promoted into the supervisor's position.

169. The previous occurrence was not an isolated incident. During JOHNSON'S tenure, numerous Caucasian employees have been hired, and within less than one year been trained and promoted into supervisory positions, including, Clinny Crochet, Bobby Masopost, Brian Plank, Boss Dolen and Billy Overman.

170. In fact JOHNSON filed a formal grievance over such an incident on September 23, 2009 claiming that he had more tenure and experience than Clinny Crochet, a Caucasian, who had been moved into a supervisors positions after only 90 days. JOHNSON claimed the entire application and interview process was flawed. An investigation revealed that due to some "inconsistencies" in the interview/selection process it would be started over. Regardless, Crochet was still promoted into the supervisors position even though he had less experience and tenure than JOHNSON.

171. Further, in 2010 JOHNSON learned that PLAINTIFF GOODSON had assumed the position of "interim crew supervisor" while Emitt Sandridge took a leave of absence and that after working thirteen days in the position, GOODSON had inquired whether he would be paid at

39

the supervisory level consistent with Departmental policy which calls for the increased pay after fifteen days. After General Supervisors Beverly Gillespie confirmed that the policy would be applicable, GOODSON was replaced by Wilford Sandridge, Caucasian, even though Sandridge was already supervising a different work crew.

172. Additionally, throughout his tenure, JOHNSON was advised that it was necessary to hold a CDL in order to qualify for advancement into a supervisory position. In early January 2012 the DEFENDANT notified all employees within the Water Maintenance Division that in order to maintain their employment each had to possess a CDL. After which JOHNSON learned that several current Caucasian supervisors did not possess a CDL, including Wilford Sandridge, James Kelly and Billy Overman, again evidencing the intentional disparate treatment directed at African-American employees.

173. Nonetheless, JOHNSON continued to apply for other positions which would have offered better opportunities for increased compensation and job growth. In fact, JOHNSON submitted a total of ninety-one (91) applications for a variety of open positions within the Department of Public Utilities, including ten (10) for open supervisors' positions. JOHNSON was not promoted. In fact, during his eleven year tenure he was never moved out of Band 1 employee status. A Band reserved for probationary employees and those with less than one year tenure.

174. Notably, throughout his tenure, JOHNSON received yearly evaluations evidencing he more than met the DEFENDANTS job expectations. Regardless, rather than provide the necessary training and allow JOHNSON to advance with the Water Maintenance Division, DEFENDANT re-hired a Caucasian, Wilford Sandridge, who had been terminated by the DEFENDANT.

175.    It was not until after complaining of racial discrimination that JOHNSON was transferred from the Pipefitter 1 position, into the position of Acting Supervisor-Valve Truck around January 23, 2012.  The transfer is **not** a promotion, but only a **temporary placement**. JOHNSON will return to his Pipefitter 1 position upon the return of Emmitt Sandridge, Caucasian from a medical leave of absence.

176.    During his tenure, JOHNSON wanted to advance within the Water Maintenance Division, both through increased Band Levels as well as through promotions into supervisory positions.  However, after requesting the necessary training on numerous occasions, to no avail; witnessing the treatment of the other PLAINTIFFS in their unsuccessful quests for advancement as well as his own; JOHNSON was fully aware of the unwritten policy within the Division that African-Americans were neither to be provided with the necessary training to move upward within the Band Levels or to be considered for advancement into supervision.

177.    In addition, throughout his tenure, JOHNSON has been subjected to disparate treatment through the assignment of over-time and duty-time.  JOHNSON and the other PLAINTIFFS have received less favorable days, including weekend and holiday assignments; and on average have received less scheduled over-time than their Caucasian counter-parts.

178.    Further, JOHNSON and the other PLAINTIFFS have had their over-time hours decreased so that the over-time hours can be given to Chris Modin, a Caucasian who does not even work within the Water Maintenance DIVISION.

179.    Ultimately, the Department of Public Utilities-Water Maintenance Division has historically been segregated, with Caucasians holding all upper management positions.  Those same managers enacted procedures that ensured African-Americans, including JOHNSON remained in the lowest paying positions with no opportunity to advance.  Upper management

allows an atmosphere of racial intimidation through actively engaging in racial slurs, and threats and by refusing to take any remedial action when brought to their attention. JOHNSON and the other PLAINTIFFS are commonly referred to as the "nigger-8s", the "crazy 8", and "the trouble makers", by their Caucasian co-workers, who have selected and identified one room within the Water Maintenance Division as the "Country Club". The Caucasian employees, both management and hourly, spend time there, and it is made very clear that the African-American employees are not welcome. JOHNSON has heard racial jokes and epithets coming from the room and has otherwise been excluded. Further, each of the PLAINTIFFS were photographed and their picture hung in the Water Maintenance office by their supervisor so they were easily identifiable by all management level personnel, resulting in further isolation and ostracization.

180. JOHNSON has opposed these discriminatory practices on his own behalf and on behalf of other similarly situated minority employees on a number of occasions. Including but not limited to on or about March 1, 2011 when JOHNSON submitted a complaint to DEFENDANT'S Human Resources Department identifying disparate treatment relative to training opportunities, promotional opportunities, and the enforcement of internal policies; as well as racial harassment due to the continuous use of racial slurs and demeaning racial jokes.

181. In response to his complaints, JOHNSON has been unfairly targeted, given disciplinary "write-ups", denied training and has been subjected to further harassment, intimidation, isolation, ostracism and retribution, including threats that he will lose his job due to poor performance all in retaliation for having opposed racial discrimination.

182. Specifically, JOHNSON and the other PLAINTIFFS were required to attend a meeting on or about August 24, 2011 where they were advised that Michael Bellman, the Deputy Director of the Department of Public Utilities, and Melvin Lee, the Operations Manager, had

determined that "effective immediately" there would be strict enforcement of the DEFENDANT'S dress code, attendance policy and employee conduct policies. At that time the PLAINTIFFS were also advised that if they did not increase their productivity their jobs would be outsourced to private contractors.

183. JOHNSON interpreted these statements as a threat to his continued employment and a strategic measure intended to force JOHNSON to stop complaining about racial discrimination and harassment.

184. JOHNSON and the other PLAINTIFFS filed a joint complaint of retaliation against Mr. Bellman and Mr. Lee for their conduct not only in the August 24th meeting, but also during subsequent meetings where the PLAINTIFFS were denigrated by both men who screamed disrespectfully at them, and told them that they had no say in any job related matter, and that "they did not work in a democracy".

185. During such a meeting, around November of 2011 Mr. Bellman began screaming at JOHNSON, telling him to "shut up" and threatening him with insubordination when JOHNSON asserted that the PLAINTIFFS were being retaliated against with regard to the enforcement of policies against them, but not the Caucasians within the Division.

186. Around December 19, 2011 the DEFENDANT generated a memorandum identifying the enforcement of certain "policies" within the Water Maintenance Division. The memorandum states that "Water Maintenance personnel will not loiter in the personnel vehicle parking area, or on employee vehicles parked in the parking area, during work hours." It goes onto state "They are to do their work and if waiting for a supervisor, stand by the company vehicle or be with the supervisor." It is upon information and belief that no other Division

within the Department of Public Works was affected by this memorandum, only the Water Maintenance Division where all the PLAINTIFFS work.

187. The December 19th memorandum intentionally targets JOHNSON and the other PLAINTIFFS in that they historically wait outside in the parking lot near the company vehicles for their supervisors who work inside completing paperwork or obtaining work assignments.

188. Since the issuance of the December 19th memorandum, JOHNSON has been threatened with being written up for "loitering" simply because he was standing in the parking lot area waiting for his supervisor to arrive. In fact, on January 17, 2012 a memorandum was sent to Wilford Sandridge, Caucasian supervisor, directing him to "take corrective action" against JOHNSON for loitering.

189. JOHNSON is aware that other PLAINTIFFS have received disciplinary actions under these new policies, as well as under old policies that are being strictly enforced against the PLAINTIFFS, but not Caucasian employees, and is fearful that he will be terminated if he continues to advocate against racial discrimination and racial harassment within the CITY OF RICHMOND.

**E.    ELWOOD MAYFIELD**

190. MAYFIELD is an African-American male employed since June 23, 2008 by the DEFENDANT CITY OF RICHMOND in the Department of Public Utilities- Water Maintenance. He was initially hired as an Equipment Operator 1, however on October 12, 2009 he was transferred into the position of Pipefitter 1.

191. Throughout his employment, MAYFIELD has been exposed to a hostile work environment based on his race, in that he was subjected to racial slurs, epithets and jokes including:

44

a. MAYFIELD heard Warren Proffit, a Caucasian, call PLAINTIFF HARRIS a "Porch monkey"

b. Around October of 2010 MAYFIELD heard Greg Walton, a Caucasian, tell Hassan Shamooro that if he wanted a ride back to their department, he would have to ride in the back of their truck and bark like a dog.

c. Throughout MAYFIELD'S employment numerous racial slurs have been directed at him and other African-American co-workers, including "NIGGER", "STUPID NIGGER", "SHUT UP NIGGER", and "BOY", by his Caucasian co-workers and supervisors.

192. MAYFIELD complained to his supervisors about the slurs, jokes and demeaning statements. However, they failed to take appropriate responsive action. In fact, on many occasions because supervisors were involved, either witnessing the conduct or directly participating, it was understood throughout the Division that such conduct was condoned.

193. After complaining MAYFIELD was subjected to racially motivated threats, intimidation and harassment, including but not limited to the constant threat of discharge or bodily harm.

194. Throughout his employment, MAYFIELD has also been exposed to disparate treatment due to his race by the DEFENDANT through its enactment of a pattern and policy of disproportionate enforcement of policies, frustrating his opportunities for advancement and fundamentally altering the terms and conditions of MAYFIELD'S employment.

195. According to DEFENDANT'S current policy, Department of Public Utilities-Water Maintenance employees are to be placed within a skill-compensation based range called Broad Band Progress Program. Each employee is rated and placed in a Band between 1 and 5. Band 1 is identified as a range for probationary employees and employees with 1 year or less tenure and requires the least amount of work related skills.

196. MAYFIELD and the other employees within the Water Maintenance Division were to be evaluated based on their experience and skill level and placed within a Band ranging from 1 to 5.

197. During MAYFIELD'S employment with the DEFENDANT he was placed into the lowest pay range, rated as a Band 1 level employee, where he currently remains, after four years of employment with DEFENDANT.

198. It is upon information and belief that the Caucasian employees hired into the Department of Public Utilities- Water Maintenance Division were hired at higher Band levels, or paid more than MAYFIELD within the pay scale and have historically benefited from higher wage increases throughout their employment than MAYFIELD and the other PLAINTIFFS.

199. Specifically, MAYFIELD was hired roughly two weeks before Greg Walton, Caucasian, with both men holding the position of Equipment Operator 1. Within two weeks, Walton was promoted to a Band 2 level Equipment Operator, being paid more than MAYFIELD, even though the two performed the exact same job duties.

200. Moreover, although MAYFIELD was hired as an Equipment Operator within approximately two months he was performing the duties of a Pipefitter 1, which is ranked as a higher paid position. According to policy, after fifteen days, MAYFIELD should have received a five percent pay increase, but did not. MAYFIELD was required to work as a Pipefitter, yet be paid as an Equipment Operator for over a year with no pay increase or promotion. Significantly, even his performance evaluation for 2008-2009 depicts that he was performing the pipefitter job. During this same time, MAYFIELD applied for an open Pipefitter position, but was not even interviewed. Rather the position was filled by Clinny Crochet, Caucasian.

201.    MAYFIELD complained to General Supervisor, Beverly Gillespie that he had not even been considered for the open Pipefitter position, despite that he was performing the duties of the position.    His complaint was not investigated, nor taken seriously by the DEFENDANT. To the contrary, MAYFIELD was targeted by the DEFENDANT in an attempt to ensure his complaints ceased. Specifically, including but not limited to engaging in a pattern of requiring MAYFIELD to participate in numerous "random" drug tests.

202.    Additionally, on numerous occasions less tenured Caucasian employees were provided with opportunities to advance upward within the Band levels, resulting in higher pay, through training provided on the backhoe, valve trucks, hydrant trucks and cranes. Such training is necessary to both obtain the skills necessary to move into the Band 2 through 5 levels, as well as to obtain promotions into supervision.    The training is customarily provided to Caucasian employees and not African-American employees.

203.    Among those Caucasian employees having less tenure but receiving the identified training are Clinny Crochet, Brian Plank, Dave Thomas, Greg Walton, Bobby Masopost, Boss Dolen and Billy Overman.

204.    Despite his numerous requests, MAYFIELD has been excluded from training on the backhoe, valve, crane and hydrant trucks. Specifically, in 2009 MAYFIELD along with the other PLAINTIFFS advised the General Supervisor, Beverly Gillespie that they wanted to obtain the afore-listed training.    Mr. Gillespie directed them to sign up for the training with Management Analyst, Terrance Gray who allegedly was responsible for maintaining all training requests.    Prior to 2009, MAYFIELD and the other PLAINTIFFS had requested this training from Mr. Gillespie, but had never been told that they needed to formally sign up for it.

205.    Regardless, even after "formally signing up", MAYFIELD received no training on the backhoe, valve, crane and hydrant trucks.

206.    Notably, soon after MAYFIELD signed up for the training in 2009, Caucasian Greg Walton was assigned to train on the backhoe.

207.    Since 2009, MAYFIELD has verbally requested training on the backhoe, crane, valve and hydrant trucks on a number of occasions from Mr. Gillespie and other members of management. MAYFIELD was not given any of the requested training.

208.    In fact, MAYFIELD was told by a number of Caucasian employees that African-Americans were not allowed on the valve trucks, a specialized vehicle which is used to shut down the Cities water pipes when they are in need of repair. Unfortunately, if you don't know how to do this you will not pass the test to become a supervisor as it is a necessary skill.

209.    In addition to the disparate training opportunities, DEFENDANT has adopted an unwritten policy that African-American are not to advance into supervisory positions within in the Water Maintenance Division. It is upon information and belief, that over the past forty years only two African-Americans have held such supervisory positions.

210.    In mid March of 2010, MAYFIELD became aware the PLAINTIFF BRADLEY had applied for a supervisory position and had been selected to undergo the interviewing process. MAYFIELD learned that the process encompassed both a written test and interview with a panel of three management level employees and that the written test portion included numerous questions requiring knowledge acquired through the operation of the valve, hydrant, backhoe and crane, none of which MAYFIELD and the other PLAINTIFFS had been trained on. MAYFIELD formed the belief that due to his lack of training he was placed in a distinct

disadvantage when compared with his Caucasian counter-parts who had received such training, and thus had the necessary skills to do better on the supervisors test.

211.    MAYFIELD also became aware that the entire supervisor selection process was simply a façade, in that the Caucasian managers had already pre-determined what Caucasian employee would get the promotion, going so far as to provide the pre-determined candidate with the test answers.

212.    Soon after the interviewing process was completed, Caucasian Bobby Masopost, who had less tenure and experience on the job than PLAINTIFF BRADLEY, was promoted into the supervisor's position.

213.    The previous occurrence was not an isolated incident. During MAYFIELD'S tenure, numerous Caucasian employees have been hired, and within less than one year been trained and promoted into supervisory positions, including, Clinny Crochet, Bobby Masopost, Brian Plank, Boss Dolen and Billy Overman.

214.    MAYFIELD also became aware the PLAINTIFF JOHNSON has filed a formal grievance over such an incident on September 23, 2009, claiming that he had more tenure and experience than Clinny Crochet, a Caucasian, who had been moved into a supervisory position after only 90 days. JOHNSON had claimed the entire application and interview process was flawed. MAYFIELD learned that despite an investigation occurring which revealed "inconsistencies" in the interview/selection process, Crochet was still promoted into the supervisors position, even though he had less experience and tenure than JOHNSON.

215.    Further, in 2010 MAYFIELD learned that PLAINTIFF GOODSON had assumed the position of "interim crew supervisor" while Emitt Sandridge took a leave of absence and that after working thirteen days in the position, GOODSON had inquired whether he would be paid at

the supervisory level consistent with Departmental policy which calls for the increased pay after fifteen days. After General Supervisors Beverly Gillespie confirmed that the policy would be applicable, GOODSON was replaced by Wilford Sandridge, Caucasian, even though Sandridge was already supervising a different work crew.

216. Additionally, throughout his tenure, MAYFIELD has been advised that he will not qualify for advancement into a supervisory position until he obtains his Commercial Driver's License (hereafter "CDL). MAYFIELD has requested the requisite training in order to obtain his CDL, the most recent occurring on or about January, 2012. MAYFIELD has been denied the training, which historically has been provided to Caucasian employees within the Water Maintenance DIVISION.

217. Notably, current supervisors including Wilford Sandridge, James Kelly and Billy Overman did not possess a CDL at the time they were promoted into supervision, and it is upon information and belief that they still do not possess a CDL.

218. Significantly, throughout his tenure, MAYFIELD received yearly evaluations evidencing he met the DEFENDANTS job expectations. Regardless, rather than provide the necessary training and allow MAYFIELD to advance with the Water Maintenance Division, DEFENDANT re-hired a Caucasian, Wilford Sandridge, who had been terminated by the DEFENDANT.

219. During his tenure, MAYFIELD wanted to advance within the Water Maintenance Division, both through increased Band Levels as well as through promotions into supervisory positions. However, after requesting the necessary training on numerous occasions, to no avail; witnessing the treatment of the other PLAINTIFFS in their unsuccessful quests for advancement as well as his own; MAYFIELD was fully aware of the unwritten policy within the Division that

African-Americans were neither to be provided with the necessary training to move upward within the Band Levels or to be considered for advancement into supervision. As a result, MAYFIELD did not apply for any other open supervisory positions, as he knew he would not be considered.

220. In addition, throughout his tenure, MAYFIELD has been subjected to disparate treatment through the assignment of over-time and duty-time. MAYFIELD and the other PLAINTIFFS have received less favorable days, including weekend and holiday assignments; and on average have received less scheduled over-time than their Caucasian counter-parts.

221. Further, MAYFIELD and the other PLAINTIFFS have had their over-time hours decreased so that the over-time hours can be given to Chris Modin, a Caucasian who does not even work within the Water Maintenance Division.

222. Ultimately, the Department of Public Utilities-Water Maintenance Division has historically been segregated, with Caucasians holding all upper management positions. Those same managers enacted procedures that ensured African-Americans, including MAYFIELD remained in the lowest paying positions with no opportunity to advance. Upper management allows an atmosphere of racial intimidation through actively engaging in racial slurs, and threats and by refusing to take any remedial action when brought to their attention. MAYFIELD and the other PLAINTIFFS are commonly referred to as the "nigger-8s", the "crazy 8", and "the trouble makers", by their Caucasian co-workers, who have selected and identified one room within the Water Maintenance Division as the "Country Club". The Caucasian employees, both management and hourly, spend time there, and it is made very clear that the African-American employees are not welcome. MAYFIELD has heard racial jokes and epithets coming from the room and has otherwise been excluded. Further, each of the PLAINTIFFS were photographed

51

and their picture hung in the Water Maintenance office by their supervisor so they were easily identifiable by all management level personnel, resulting in further isolation and ostracization.

223. MAYFIELD has opposed these discriminatory practices on his own behalf and on behalf of other similarly situated minority employees on a number of occasions. Including but not limited to on or about March 1, 2011 when MAYFIELD submitted a complaint to DEFENDANT'S Human Resources Department identifying disparate treatment relative to training opportunities, promotional opportunities, and the enforcement of internal policies; as well as racial harassment due to the continuous use of racial slurs and demeaning racial jokes.

224. In response to his complaints, MAYFIELD has been unfairly targeted, given disciplinary "write-ups" denied training and has been subjected to further harassment, intimidation, isolation, ostracism and retribution, including threats that he will lose his job due to poor performance all in retaliation for having opposed racial discrimination.

225. Specifically, MAYFIELD and the other PLAINTIFFS were required to attend a meeting on or about August 24, 2011 where they were advised that Michael Bellman, the Deputy Director of the Department of Public Utilities, and Melvin Lee, the Operations Manager, had determined that "effective immediately" there would be strict enforcement of the DEFENDANT'S dress code, attendance policy and employee conduct policies. At that time, the PLAINTIFFS were also advised that if they did not increase their productivity their jobs would be outsourced to private contractors.

226. MAYFIELD interpreted these statements as a threat to his continued employment and a strategic measure intended to force MAYFIELD to stop complaining about racial discrimination and harassment.

227. MAYFIELD and the other PLAINTIFFS filed a joint complaint of retaliation against Mr. Bellman and Mr. Lee for their conduct not only in the August 24th meeting, but also during subsequent meetings where the PLAINTIFFS were denigrated by both men who screamed disrespectfully at them, and told them that they had no say in any job related matter, and that "they did not work in a democracy".

228. During such a meeting, around November of 2011 Mr. Bellman began screaming at PLAINTIFF JOHNSON, in front of MAYFIELD, telling him to "shut up" and threatening him with insubordination when JOHNSON asserted that the PLAINTIFFS were being retaliated against with regard to the enforcement of policies against them, but not the Caucasians within the Division.

229. Around December 19, 2011 the DEFENDANT generated a memorandum identifying the enforcement of certain "policies" within the Water Maintenance Division. The memorandum states that "Water Maintenance personnel will not loiter in the personnel vehicle parking area, or on employee vehicles parked in the parking area, during work hours." It goes onto state "They are to do their work and if waiting for a supervisor, stand by the company vehicle or be with the supervisor." It is upon information and belief that no other Division within the Department of Public Works was affected by this memorandum, only the Water Maintenance Division where all the PLAINTIFFS work.

230. The December 19th memorandum intentionally targets MAYFIELD and the other PLAINTIFFS in that they historically wait outside in the parking lot near the company vehicles for their supervisors who work inside completing paperwork or obtaining work assignments.

231. Since the issuance of the December 19th memorandum, MAYFIED has been threatened with being written up for "loitering" simply because he was standing in the parking lot area waiting for his supervisor to arrive.

232. MAYFIELD is aware that other PLAINTIFFS have received disciplinary actions under these new policies as well as under old policies that are being strictly enforced against the PLAINTIFFS, but not Caucasian employees, and is fearful that he will be terminated if he continues to advocate against racial discrimination and racial harassment within the CITY OF RICHMOND.

233. Further, around January, 2012 MAYFIELD and the other PLAINTIFFS were advised that anyone not in possession of a CDL faced termination. Since MAYFIELD had previously requested such training from within the Water Maintenance DIVISION, but been denied, he interpreted this new "requirement" as yet another threat and act of retaliation for having complained about the ongoing racial discrimination and harassment.

## F.    GABRIEL POSEY

234. POSEY is an African-American male employed since September 15, 2008 by the DEFENDANT CITY OF RICHMOND in the Department of Public Utilities- Water Maintenance as a Pipefitter.

235. Throughout his employment, POSEY has been exposed to a hostile work environment based on his race, in that he was subjected to racial slurs, epithets and jokes including, but not limited to, the following:

   a.    In 2008 POSEY heard Caucasian General Supervisor Beverly Gillespie refer to WILLIAMS as "boy" and call him "buckwheat" after looking at WILLIAMS hair.

   b.    On or about February 1, 2009, POSEY was assigned to work with Caucasians, Emit Sandridge, and Greg Walton as well as PLAINTIFFS HARRIS and GOODSON. Sandridge, who was the assigned crew supervisor, along with

Walton called POSEY such names as "a queer from Texas". POSEY overhead both Sandridge and Walton refer to GOODSON as a "gorilla" and "animal" and HARRIS as a "pussy".

c. On or about February 2, 2009 POSEY complained to General Supervisor, Beverly Gillespie, a Caucasian, about the things said by Sandridge and Walton. Gillespie advised POSEY "not to take things so seriously", and suggested he "should come and *hang* out under the tree at his house, where all the other black guys hung." POSEY understood this remark as a referenced to hanging from a noose, intended to intimidate him from further racial complaints.

d. Around April, 2009 two work crews were combined, one headed by supervisor Emit Sandridge, the other by supervisor Wilford Sandridge, the racial slurs and jokes increased to a daily basis. Wilford Sandridge would commonly remark about the PLAINTIFFS GOODSON, HARRIS and POSEY'S physical size, asking question such as whether they had a "big black penis", he would touch their arms and legs and other body parts, commenting about them being "strong like a gorilla". Sandridge also frequently stated "you niggers are all the same, you like a lot of women and loud music".

e. In 2009 POSEY heard Caucasian supervisor Tim Shroyer call PLAINTIFF WILLIAMS "boy", to which WILLIAMS advised Shroyer not to refer to him as a "boy" Shroyer responded as follows "boy, don't sass me, I'm not afraid of you" and "I got something for your ass". Both POSEY and WILLIAMS took Shroyer's statements as a threat.

f. During the Summer of 2010 Caucasian Greg Walton called GOODSON, HARRIS and POSEY "stupid niggers" and told them to "shut up" while at a job site.

g. On February 3, 2012 POSEY asked Supervisor Wilford Sandridge about a piece of equipment he had never seen before, Sandridge loudly stated in a demeaning manner that he had not seen it before because a person has to be "intelligent enough to use it", inferring POSEY was not. This was said in front of Supervisor, Terrance Grey and Interim Department Manager, Melvin Lee. After complaining, POSEY was removed as the "driver" of the Valve & Hydrant truck.

h. Throughout POSEY'S employment numerous racial slurs have been directed at him and other African-American co-workers, including "NIGGER", "STUPID NIGGER", "SHUT UP NIGGER", and "BOY", by his Caucasian co-workers and supervisors.

236. POSEY complained to his supervisors about the slurs, jokes and demeaning statements. However, they failed to take appropriate responsive action. In fact, on many

occasions because supervisors were involved, either witnessing the conduct or directly participating, it was understood throughout the Division that such conduct was condoned.

237. After complaining POSEY was subjected to racially motivated threats, intimidation and harassment, including but not limited to the constant threat of discharge or bodily harm.

238. Throughout his employment, POSEY has also been exposed to disparate treatment due to his race by the DEFENDANT through its enactment of a pattern and policy of disproportionate enforcement of policies, frustrating his opportunities for advancement and fundamentally altering the terms and conditions of POSEY'S employment.

239. According to DEFENDANT'S current policy, Department of Public Utilities-Water Maintenance employees are to be placed within a skill-compensation based range called Broad Band Progress Program. Each employee is rated and placed in a Band between 1 and 5. Band 1 is identified as a range for probationary employees and employees with 1 year or less tenure and requires the least amount of work related skills.

240. POSEY and the other employees within the Water Maintenance Division were to be evaluated based on their experience and skill level and placed within a Band ranging from 1 to 5.

241. During POSEY'S employment with the DEFENDANT he was placed into the lowest pay range, rated as a Band 1 level employee, where he currently remains, after four years of employment with the CITY OF RICHMOND.

242. It is upon information and belief that the Caucasian employees hired into the Department of Public Utilities- Water Maintenance Division were hired at higher Band levels, or

paid more than POSEY within the pay scale and have historically benefited from higher wage increases throughout their employment than POSEY and the other PLAINTIFFS.

243. Additionally, on numerous occasions less tenured Caucasian employees were provided with opportunities to advance upward within the Band levels, resulting in higher pay, through training provided on the backhoe, valve trucks, hydrant trucks and cranes. Such training is necessary to both obtain the skills necessary to move into the Band 2 through 5 levels, as well as to obtain promotions into supervision. The training is customarily provided to Caucasian employees and not African-American employees.

244. Among those Caucasian employees having less tenure but receiving the identified training are Clinny Crochet, Brian Plank, Dave Thomas, Greg Walton, Bobby Masopost, Boss Dolen and Billy Overman.

245. Despite his numerous requests, POSEY has been excluded from training on the backhoe, valve, crane and hydrant trucks. Specifically, in 2009 POSEY along with the other PLAINTIFFS advised the General Supervisor, Beverly Gillespie that they wanted to obtain the afore-listed training. Mr. Gillespie directed them to sign up for the training with Management Analyst, Terrance Gray who allegedly was responsible for maintaining all training requests. Prior to 2009, POSEY and the other PLAINTIFFS had requested this training from Mr. Gillespie, but had never been told that they needed to formally sign up for it.

246. Regardless, even after "formally signing up", POSEY received no training on the backhoe, valve, crane and hydrant trucks.

247. Notably, soon after POSEY signed up for the training in 2009, Caucasian Greg Walton was assigned to train on the backhoe.

248. Since 2009 up through the present, POSEY has requested training on the backhoe, crane, valve and hydrant trucks on a number of occasions from Mr. Gillespie, Willie Horton, Melvin Lee, and other members of management. POSEY was not given any of the requested training.

249. In addition to the disparate training opportunities, DEFENDANT has adopted an unwritten policy that African-American are not to advance into supervisory positions within in the Water Maintenance Division. It is upon information and belief, that over the past forty years only two African-Americans have held such supervisory positions.

250. In addition to the disparate training opportunities, DEFENDANT has adopted an unwritten policy that African-Americans are not to advance into supervisory positions within the Water Maintenance Division.

251. In mid March of 2010, POSEY became aware the PLAINTIFF BRADLEY had applied for a supervisory position and had been selected to undergo the interviewing process. POSEY learned that the process encompassed both a written test and interview with a panel of three management level employees and that the written test portion included numerous questions requiring knowledge acquired through the operation of the valve, hydrant, backhoe and crane, none of which POSEY and the other PLAINTIFFS had been trained on. POSEY formed the belief that due to his lack of training he was placed in a distinct disadvantage when compared with his Caucasian counter-parts who had received such training, and thus had the necessary skills to do better on the supervisors test.

252. POSEY also became aware that the entire supervisor selection process was simply a façade, in that the Caucasian managers had already pre-determined what Caucasian employee

would get the promotion, going so far as to provide the pre-determined candidate with the test answers.

253.    Soon after the interviewing process was completed, Caucasian Bobby Masopost, who had less tenure and experience on the job than PLAINTIFF BRADLEY, was promoted into the supervisor's position.

254.    The previous occurrence was not an isolated incident. During POSEY'S tenure, numerous Caucasian employees have been hired, and within less than one year been trained and promoted into supervisory positions, including, Clinny Crochet, Bobby Masopost, Brian Plank, Boss Dolen and Billy Overman.

255.    POSEY also became aware the PLAINTIFF JOHNSON has filed a formal grievance over such an incident on September 23, 2009, claiming that he had more tenure and experience than Clinny Crochet, a Caucasian, who had been moved into a supervisory position after only 90 days.   JOHNSON had claimed the entire application and interview process was flawed. POSEY learned that despite an investigation occurring which revealed "inconsistencies" in the interview/selection process, Crochet was still promoted into the supervisors position, even though he had less experience and tenure than JOHNSON.

256.    Further, in 2010 POSEY learned that PLAINTIFF GOODSON had assumed the position of "interim crew supervisor" while Emitt Sandridge took a leave of absence and that after working thirteen days in the position, GOODSON had inquired whether he would be paid at the supervisory level consistent with Departmental policy which calls for the increased pay after fifteen days.   After General Supervisors Beverly Gillespie confirmed that the policy would be applicable,  GOODSON was replaced by Wilford Sandridge, Caucasian, even though Sandridge was already supervising a different work crew.

257. Additionally, throughout his tenure, POSEY has been advised that in order to qualify for advancement into a supervisory position you must have a CDL. POSEY has a CDL.

258. Notably, current supervisors including Wilford Sandridge, James Kelly and Billy Overman did not possess a CDL at the time they were promoted into supervision, and it is upon information and belief that they still do not possess a CDL.

259. In fact, in January, 2012 POSEY was assigned to the Valve & Hydrant truck in order to "train", but in actuality he was tasked with driving the truck, since crew supervisor Wilford Sandridge, openly admitted he did not possess a CDL. As mentioned previously, after POSEY complained about Sandridge's demeaning commentary that POSEY was not intelligent enough to be trained on equipment within the valve & hydrant truck, POSEY was removed from "training" and placed back into the position of pipefitter 1.

260. Significantly, throughout his tenure, POSEY received yearly evaluations evidencing he met the DEFENDANTS job expectations. Regardless, rather than provide the necessary training and allow POSEY to advance with the Water Maintenance DIVISION, DEFENDANT re-hired a Caucasian, Wilford Sandridge, who had been terminated by the DEFENDANT.

261. During his tenure, POSEY wanted to advance within the Water Maintenance Division, both through increased Band Levels as well as through promotions into supervisory positions. However, after requesting the necessary training on numerous occasions, to no avail; witnessing the treatment of the other PLAINTIFFS in their unsuccessful quests for advancement as well as his own; POSEY was fully aware of the unwritten policy within the Division that African-Americans were neither to be provided with the necessary training to move upward within the Band Levels or to be considered for advancement into supervision. As a result,

POSEY did not apply for any other open supervisory positions, as he knew he would not be considered.

262.     In addition, throughout his tenure, POSEY has been subjected to disparate treatment through the assignment of over-time and duty-time.     POSEY and the other PLAINTIFFS have received less favorable days, including weekend and holiday assignments; and on average have received less scheduled over-time than their Caucasian counter-parts.

263.     Further, POSEY and the other PLAINTIFFS have had their over-time hours decreased so that the over-time hours can be given to Chris Modin, a Caucasian who does not even work within the Water Maintenance Division.

264.     Ultimately, the Department of Public Utilities-Water Maintenance Division has historically been segregated, with Caucasians holding all upper management positions. Those same managers enacted procedures that ensured African-Americans, including POSEY remained in the lowest paying positions with no opportunity to advance.     Upper management allows an atmosphere of racial intimidation through actively engaging in racial slurs, and threats and by refusing to take any remedial action when brought to their attention.     POSEY and the other PLAINTIFFS are commonly referred to as the "nigger-8s", the "crazy 8", and "the trouble makers", by their Caucasian co-workers, who have selected and identified one room within the Water Maintenance Division as the "Country Club".     The Caucasian employees, both management and hourly, spend time there, and it is made very clear that the African-American employees are not welcome. POSEY has heard racial jokes and epithets coming from the room and has otherwise been excluded. Further, each of the PLAINTIFFS were photographed and their picture hung in the Water Maintenance office by their supervisor so they were easily identifiable by all management level personnel, resulting in further isolation and ostracization.

265. POSEY has opposed these discriminatory practices on his own behalf and on behalf of other similarly situated minority employees on a number of occasions. Including but not limited to on or about March 1, 2011 when POSEY submitted a complaint to DEFENDANTS Human Resources Department identifying disparate treatment relative to training opportunities, promotional opportunities, and the enforcement of internal policies; as well as racial harassment due to the continuous use of racial slurs and demeaning racial jokes.

266. In response to his complaints, POSEY has been unfairly targeted, given disciplinary "write-ups", denied training and has been subjected to further harassment, intimidation, isolation, ostracism and retribution, including threats that he will lose his job due to poor performance all in retaliation for having opposed racial discrimination.

267. Specifically, POSEY and the other PLAINTIFFS were required to attend a meeting on or about August 24, 2011 where they were advised that Michael Bellman, the Deputy Director of the Department of Public Utilities, and Melvin Lee, the Operations Manager, had determined that "effective immediately" there would be strict enforcement of the DEFENDANT'S dress code, attendance policy and employee conduct policies. At that time, the PLAINTIFFS were also advised that if they did not increase their productivity their jobs would be outsourced to private contractors.

268. POSEY interpreted these statements as a threat to his continued employment with DEFENDANT and a strategic measure intended to force POSEY to stop complaining about racial discrimination and harassment.

269. POSEY and the other PLAINTIFFS filed a joint complaint of retaliation against Mr. Bellman and Mr. Lee for their conduct not only in the August 24th meeting, but also during subsequent meetings where the PLAINTIFFS were denigrated by both men who screamed

disrespectfully at them, and told them that they had no say in any job related matter as "they did not work in a democracy".

270.    During such a meeting, around November of 2011 Mr. Bellman began screaming at PLAINTIFF JOHNSON, in front of POSEY, telling him to "shut up" and threatening him with insubordination when JOHNSON asserted that the PLAINTIFFS were being retaliated against with regard to the enforcement of policies against them, but not the Caucasians within the DIVISION.

271.    Around December 19, 2011 the DEFENDANT generated a memorandum identifying the enforcement of certain "policies" within the Water Maintenance Division. The memorandum states that "Water Maintenance personnel will not loiter in the personnel vehicle parking area, or on employee vehicles parked in the parking area, during work hours." It goes onto state "They are to do their work and if waiting for a supervisor, stand by the company vehicle or be with the supervisor." It is upon information and belief that no other Division within the Department of Public Works was affected by this memorandum, only the Water Maintenance Division where all the PLAINTIFFS work.

272.    The December 19th memorandum intentionally targets POSEY and the other PLAINTIFFS in that they historically wait outside in the parking lot near the company vehicles for their supervisors who work inside completing paperwork or obtaining work assignments.

273.    Since the issuance of the December 19th memorandum, POSEY has been threatened with being written up for "loitering" simply because he was standing in the parking lot area waiting for his supervisor to arrive.

274.    POSEY is aware that other PLAINTIFFS have received disciplinary actions under these new policies as well as under old policies that are being strictly enforced against the

PLAINTIFFS, but not Caucasian employees, and is fearful that he will be terminated if he continues to advocate against racial discrimination and racial harassment within the CITY OF RICHMOND.

275. Additionally, POSEY has received numerous disciplinary actions since complaining in March of 2011, including:

a. POSEY was placed on leave without pay on April 14, 2011 for failing to advise his supervisor he would not be at work.

b. On January 23, 12 POSEY received a written counseling notice for "dereliction of duty" for allegedly not responding quickly enough to Bobby Masopust.

c. On February 7, 2012 POSEY received a written reprimand for neglect of duty and failing to give his supervisor proper notice of any absence or leaving work on two separate occasions.

## G. LAWRENCE SMITH, JR.

276. SMITH is an African-American male employed since November 2007 by the DEFENDANT CITY OF RICHMOND in the Department of Public Utilities- Water Maintenance initially as an Equipment Operator 1 then as a Pipefitter 1.

277. Throughout his employment, SMITH has been exposed to a hostile work

278. environment based on his race, in that he was subjected to racial slurs, epithets and jokes including, but not limited to, the following:

a. In 2008 SMITH heard Caucasian General Supervisor Beverly Gillespie refer to WILLIAMS as "boy" and call him "buckwheat" after looking at WILLIAMS hair.

b. In the Summer of 2010 the Caucasian acting Crew Supervisor, Boss Dolan, told SMITH "I'm white and you're black, so you do what the hell I tell you!" when SMITH provided his suggestion on the manner in which to complete a project in compliance with Departmental Policy. Dolan said this in front of PLAINTIFFS BRADLEY and WILLIAMS.

c.   Throughout SMITH'S employment numerous racial slurs have been directed at him and other African-American co-workers, including NIGGER", "STUPID NIGGER", "SHUT UP NIGGER", and "BOY", by his Caucasian co-workers and supervisors.

279.   SMITH complained to his supervisors about the slurs, jokes and demeaning statements.   However, they failed to take appropriate responsive action.   In fact, on many occasions because supervisors were involved, either witnessing the conduct or directly participating, it was understood throughout the Division that such conduct was condoned.

280.   After complaining SMITH was subjected to racially motivated threats, intimidation and harassment, including but not limited to the constant threat of discharge or bodily harm.

281.   Throughout his employment, SMITH has also been exposed to disparate treatment due to his race by the DEFENDANT through its enactment of a pattern and policy of disproportionate enforcement of policies, frustrating his opportunities for advancement and fundamentally altering the terms and conditions of SMITH'S employment.

282.   According to DEFENDANT'S current policy, Department of Public Utilities-Water Maintenance employees are to be placed within a skill-compensation based range called Broad Band Progress Program.   Each employee is rated and placed in a Band between 1 and 5. Band 1 is identified as a range for probationary employees and employees with 1 year or less tenure and requires the least amount of work related skills.

283.   SMITH and the other employees within the Water Maintenance Division were to be evaluated based on their experience and skill level and placed within a Band ranging from 1 to 5.

284.     During SMITH'S employment with the DEFENDANT he was placed into the lowest pay range, rated as a Band 1 level employee, where he currently remains, after four years of employment with the CITY OF RICHMOND.

285.     It is upon information and belief that the Caucasian employees hired into the Department of Public Utilities- Water Maintenance Division were hired at higher Band levels, or paid more than SMITH within the pay scale and have historically benefited from higher wage increases throughout their employment than SMITH and the other PLAINTIFFS.

286.     Moreover, although SMITH was hired as an Equipment Operator 1, within a short period of time he was assigned the duties of a Pipefitter, a higher paid position. According to policy, after fifteen days, SMITH should have received a five percent pay increase, but did not. SMITH was required to work as a Pipefitter, yet be paid as an Equipment Operator 1 for over four years, with no pay increase or promotion. Significantly, SMITH applied for and received an open Pipefitter position in the Gas Maintenance Division in November of 2011.

287.     SMITH complained to General Supervisor, Beverly Gillespie that he had not even been considered for any open Pipefitter positions, nor paid at a higher rate for performing the job duties of a Pipefitter.

288.     Additionally, on numerous occasions less tenured Caucasian employees were provided with opportunities to advance upward within the Band levels, resulting in higher pay, through training provided on the backhoe, valve trucks, hydrant trucks and cranes. Such training is necessary to both obtain the skills necessary to move into the Band 2 through 5 levels, as well as to obtain promotions into supervision.     The training is customarily provided to Caucasian employees and not African-American employees.

289. Among those Caucasian employees having less tenure but receiving the identified training are Clinny Crochet, Brian Plank, Dave Thomas, Greg Walton, Bobby Masopost, Boss Dolen and Billy Overman.

290. Despite his numerous requests, SMITH has been excluded from training on the backhoe, valve, crane and hydrant trucks. Specifically, in 2009 SMITH along with the other PLAINTIFFS advised the General Supervisor, Beverly Gillespie that they wanted to obtain the afore-listed training. Mr. Gillespie directed them to sign up for the training with Management Analyst, Terrance Gray who allegedly was responsible for maintaining all training requests. Prior to 2009, SMITH and the other PLAINTIFFS had requested this training from Mr. Gillespie, but had never been told that they needed to formally sign up for it.

291. Regardless, even after "formally signing up", SMITH received no training on the backhoe, valve, crane and hydrant trucks.

292. Notably, soon after SMITH signed up for the training in 2009, Caucasian Greg Walton was assigned to train on the backhoe.

293. Since 2009, SMITH has verbally requested training on the backhoe, crane, valve and hydrant trucks on a number of occasions from Mr. Gillespie and other members of management. SMITH was not given any of the requested training.

294. In addition to the disparate training opportunities, DEFENDANT has adopted an unwritten policy that African-American are not to advance into supervisory positions within in the Water Maintenance Division. It is upon information and belief, that over the past forty years only two African-Americans have held such supervisory positions.

295.    In addition to the disparate training opportunities, DEFENDANT has adopted an unwritten policy that African-Americans are not to advance into supervisory positions within the Water Maintenance Division.

296.    In mid March of 2010, SMITH became aware the PLAINTIFF BRADLEY had applied for a supervisory position and had been selected to undergo the interviewing process. SMITH learned that the process encompassed both a written test and interview with a panel of three management level employees and that the written test portion included numerous questions requiring knowledge acquired through the operation of the valve, hydrant, backhoe and crane, none of which SMITH and the other PLAINTIFFS had been trained on.    SMITH formed the belief that due to his lack of training he was placed in a distinct disadvantage when compared with his Caucasian counter-parts who had received such training, and thus had the necessary skills to do better on the supervisors test.

297.    SMITH also became aware that the entire supervisor selection process was simply a façade, in that the Caucasian managers had already pre-determined what Caucasian employee would get the promotion, going so far as to provide the pre-determined candidate with the test answers.

298.    Soon after the interviewing process was completed, Caucasian Bobby Masopost, who had less tenure and experience on the job than PLAINTIFF BRADLEY, was promoted into the supervisor's position.

299.    The previous occurrence was not an isolated incident.  During SMITH'S tenure, numerous Caucasian employees have been hired, and within less than one year been trained and promoted into supervisory positions, including, Clinny Crochet, Bobby Masopost, Brian Plank, Boss Dolen and Billy Overman.

300. SMITH also became aware the PLAINTIFF JOHNSON has filed a formal grievance over such an incident on September 23, 2009, claiming that he had more tenure and experience than Clinny Crochet, a Caucasian, who had been moved into a supervisory position after only 90 days. JOHNSON had claimed the entire application and interview process was flawed. SMITH learned that despite an investigation occurring which revealed "inconsistencies" in the interview/selection process, Crochet was still promoted into the supervisors position, even though he had less experience and tenure than JOHNSON.

301. Further, in 2010 SMITH learned that PLAINTIFF GOODSON had assumed the position of "interim crew supervisor" while Emitt Sandridge took a leave of absence and that after working thirteen days in the position, GOODSON had inquired whether he would be paid at the supervisory level consistent with Departmental policy which calls for the increased pay after fifteen days. After General Supervisors Beverly Gillespie confirmed that the policy would be applicable, GOODSON was replaced by Wilford Sandridge, Caucasian, even though Sandridge was already supervising a different work crew.

302. Additionally, throughout his tenure, SMITH has been advised that in order to qualify for advancement into a supervisory position you must have a CDL. SMITH has a CDL.

303. Notably, current supervisors including Wilford Sandridge, James Kelly and Billy Overman did not possess a CDL at the time they were promoted into supervision, and it is upon information and belief that they still do not possess a CDL.

304. Significantly, throughout his tenure, SMITH received yearly evaluations evidencing he met the DEFENDANTS job expectations. Regardless, rather than provide the necessary training and allow SMITH to advance with the Water Maintenance Division,

DEFENDANT re-hired a Caucasian, Wilford Sandridge, who had been terminated by the DEFENDANT.

305. During his tenure, SMITH wanted to advance within the Water Maintenance Division, both through increased Band Levels as well as through promotions into supervisory positions. However, after requesting the necessary training on numerous occasions, to no avail; witnessing the treatment of the other PLAINTIFFS in their unsuccessful quests for advancement as well as his own; SMITH was fully aware of the unwritten policy within the Division that African-Americans were neither to be provided with the necessary training to move upward within the Band Levels or to be considered for advancement into supervision. As a result, SMITH did not apply for any other open supervisory positions, as he knew he would not be considered.

306. In addition, throughout his tenure, SMITH has been subjected to disparate treatment through the assignment of over-time and duty-time. SMITH and the other PLAINTIFFS have received less favorable days, including weekend and holiday assignments; and on average have received less scheduled over-time than their Caucasian counter-parts.

307. Further, SMITH and the other PLAINTIFFS have had their over-time hours decreased so that the over-time hours can be given to Chris Modin, a Caucasian who does not even work within the Water Maintenance Division.

308. Ultimately, the Department of Public Utilities-Water Maintenance Division has historically been segregated, with Caucasians holding all upper management positions. Those same managers enacted procedures that ensured African-Americans, including SMITH remained in the lowest paying positions with no opportunity to advance. Upper management allows an atmosphere of racial intimidation through actively engaging in racial slurs, and threats and by

refusing to take any remedial action when brought to their attention.    SMITH and the other PLAINTIFFS are commonly referred to as the "nigger-8s", the "crazy 8", and "the trouble makers", by their Caucasian co-workers, who have selected and identified one room within the Water Maintenance Division as the "Country Club".    The Caucasian employees, both management and hourly, spend time there, and it is made very clear that the African-American employees are not welcome.  SMITH has heard racial jokes and epithets coming from the room and has otherwise been excluded.    Further, each of the PLAINTIFFS were photographed and their picture hung in the Water Maintenance office by their supervisor so they were easily identifiable by all management level personnel, resulting in further isolation and ostracization.

309.    SMITH has opposed these discriminatory practices on his own behalf and on behalf of other similarly situated minority employees on a number of occasions.    Including but not limited to on or about March 1, 2011 when SMITH submitted a complaint to DEFENDANT'S Human Resources Department identifying disparate treatment relative to training opportunities, promotional opportunities, and the enforcement of internal policies; as well as racial harassment due to the continuous use of racial slurs and demeaning racial jokes.

310.    In response to his complaints, SMITH has been unfairly targeted, given disciplinary "write-ups", denied training and has been subjected to further harassment, intimidation, isolation, ostracism and retribution, including threats that he will lose his job due to poor performance all in retaliation for having opposed racial discrimination.

311.    Specifically, SMITH and the other PLAINTIFFS were required to attend a meeting on or about August 24, 2011 where they were advised that Michael Bellman, the Deputy Director of the Department of Public Utilities, and Melvin Lee, the Operations Manager, had determined that "effective immediately" there would be strict enforcement of the

DEFENDANTS dress code, attendance policy and employee conduct policies. At that time, the PLAINTIFFS were also advised that if they did not increase their productivity their jobs would be outsourced to private contractors.

312. SMITH interpreted these statements as a threat to his continued employment with DEFENDANT and a strategic measure intended to force SMITH to stop complaining about racial discrimination and harassment.

313. SMITH and the other PLAINTIFFS filed a joint complaint of retaliation against Mr. Bellman and Mr. Lee for their conduct not only in the August 24th meeting, but also during subsequent meetings where the PLAINTIFFS were denigrated by both men who screamed disrespectfully at them, and told them that they had no say in any job related matter, and that "they did not work in a democracy".

314. During such a meeting, around November of 2011 Mr. Bellman began screaming at PLAINTIFF JOHNSON, in front of SMITH, telling him to "shut up" and threatening him with insubordination when JOHNSON asserted that the PLAINTIFFS were being retaliated against with regard to the enforcement of policies against them, but not the Caucasians within the Division.

315. Around December 19, 2011 the DEFENDANT generated a memorandum identifying the enforcement of certain "policies" within the Water Maintenance Division. The memorandum states that "Water Maintenance personnel will not loiter in the personnel vehicle parking area, or on employee vehicles parked in the parking area, during work hours." It goes onto state "They are to do their work and if waiting for a supervisor, stand by the company vehicle or be with the supervisor." It is upon information and belief that no other Division

within the Department of Public Works was affected by this memorandum, only the Water Maintenance Division where all the PLAINTIFFS work.

316. The December 19th memorandum intentionally targets SMITH and the other PLAINTIFFS in that they historically wait outside in the parking lot near the company vehicles for their supervisors who work inside completing paperwork or obtaining work assignments.

317. Since the issuance of the December 19th memorandum, SMITH has been threatened with being written up for "loitering" simply because he was standing in the parking lot area waiting for his supervisor to arrive.

318. SMITH is aware that other PLAINTIFFS have received disciplinary actions under these new policies as well as under old policies that are being strictly enforced against the PLAINTIFFS, but not Caucasian employees, and is fearful that he will be terminated if he continues to advocate against racial discrimination and racial harassment within the CITY OF RICHMOND.

## H. MILTON WILLIAMS

319. WILLIAMS is an African-American male employed since on or about February 20, 2007 by the DEFENDANT CITY OF RICHMOND in the Department of Public Utilities-Water Maintenance. WILLIAMS was initially hired as an Equipment Operator 2, he was interviewed and selected for the position of Pipefitter 1 in January, 2009.

320. Throughout his employment, WILLIAMS has been exposed to a hostile work environment based on his race, in that he was subjected to racial slurs, epithets and jokes including, but not limited to, the following:

    a.    In September, 2011 WILLIAMS was called "boy" and "nigger" by Caucasian co-worker Billy Purdy, Jr., although Supervisor Falkenstein and Cambel heard the statement they did nothing. The statement was also overhead by PLAINTIFF HARRIS.

b.   Around October of 2010 WILLIAMS heard Greg Walton, a Caucasian, tell Hassan Shamooro that if he wanted a ride back to their department, he would have to ride in the back of their truck and bark like a dog.

c.   In the Summer of 2010 WILLIAMS heard Boss Dolan, a Caucasian Crew Supervisor direct SMITH on the manner in which to perform work, stating SMITH "I'm white and you're black, so you do what the hell I tell you!"

d.   In 2009 Caucasian Supervisor, Tim Shroyer call WILLIAMS "boy", to which WILLIAMS advised Shroyer not to refer to him as a "boy". Shroyer responded as follows "boy, don't sass me, I'm not afraid of you" and "I got something for your ass". PLAINTIFF POSEY overheard the encounter, both POSEY and WILLIAMS took Shroyer's statements as a threat.

e.   In 2008 Caucasian General Supervisor Beverly Gillespie openly called WILLIAMS "boy" and "buckwheat" after looking at WILLIAMS hair, in front of other crew members.

f.   In February of 2007, after complaining to General Supervisor Beverly Gillespie about a racial slur made by a co-worker, Gillespie told WILLIAMS that he should come to his over and hang under a big oak tree where all the other black guys "hang" around. WILLIAMS understood this remark as a referenced to hanging from a noose, intended to intimidate him from further racial complaints.

g.   Throughout WILLIAMS'S employment numerous racial slurs have been directed at him and other African-American co-workers, including "NIGGER", "STUPID NIGGER", "SHUT UP NIGGER", and "BOY", by his Caucasian co-workers and supervisors.

321.   WILLIAMS complained to his supervisors about the slurs, jokes and demeaning statements. However, they failed to take appropriate responsive action. In fact, on many occasions because supervisors were involved, either witnessing the conduct or directly participating, it was understood throughout the Division that such conduct was condoned.

322.   After complaining WILLIAMS was subjected to racially motivated threats, intimidation and harassment, including but not limited to the constant threat of discharge or bodily harm for complaining.

323. Throughout his employment, WILLIAMS has also been exposed to disparate treatment due to his race by the DEFENDANT through its enactment of a pattern and policy of disproportionate enforcement of policies, frustrating his opportunities for advancement and fundamentally altering the terms and conditions of WILLIAMS'S employment.

324. According to DEFENDANT'S current policy, Department of Public Utilities- Water Maintenance employees are to be placed within a skill-compensation based range called Broad Band Progress Program. Each employee is rated and placed in a Band between 1 and 5. Band 1 is identified as a range for probationary employees and employees with 1 year or less tenure and requires the least amount of work related skills.

325. WILLIAMS and the other employees within the Water Maintenance Division were to be evaluated based on their experience and skill level and placed within a Band ranging from 1 to 5.

326. During WILLIAMS'S employment with the DEFENDANT he was placed into the lowest pay range, rated as a Band 1 level employee, where he currently remains, after three years of employment with the CITY OF RICHMOND as a Pipefitter.

327. It is upon information and belief that the Caucasian employees hired into the Department of Public Utilities- Water Maintenance Division were hired at higher Band levels, or paid more than WILLIAMS within the pay scale and have historically benefited from higher wage increases throughout their employment than WILLIAMS and the other PLAINTIFFS.

328. Additionally, on numerous occasions less tenured Caucasian employees were provided with opportunities to advance upward within the Band levels, resulting in higher pay, through training provided on the backhoe, valve trucks, hydrant trucks and cranes. Such training is necessary to both obtain the skills necessary to move into the Band 2 through 5 levels, as well

as to obtain promotions into supervision. The training is customarily provided to Caucasian employees and not African-American employees.

329. Among those Caucasian employees having less tenure but receiving the identified training are Clinny Crochet, Brian Plank, Dave Thomas, Greg Walton, Bobby Masopost, Boss Dolen and Billy Overman.

330. Despite his numerous requests, WILLIAMS has been excluded from training on the backhoe, valve, crane and hydrant trucks. Specifically, in 2009 WILLIAMS along with the other PLAINTIFFS advised the General Supervisor, Beverly Gillespie that they wanted to obtain the afore-listed training. Mr. Gillespie directed them to sign up for the training with Management Analyst, Terrance Gray who allegedly was responsible for maintaining all training requests. Prior to 2009, WILLIAMS and the other PLAINTIFFS had requested this training from Mr. Gillespie, but had never been told that they needed to formally sign up for it.

331. Regardless, even after "formally signing up", WILLIAMS received no training on the backhoe, valve, crane and hydrant trucks.

332. Notably, soon after WILLIAMS signed up for the training in 2009, Caucasian Greg Walton was assigned to train on the backhoe.

333. Also in 2009 WILLIAMS ask Beverly Williams to place him on the Valve Truck so he could be trained on it, like their Caucasian counter-parts, including Gillespie's son-in law Boss Dolen. Gillespie, who was reading a newspaper, simply looked up, made eye contact, said a resounding "NO", then went back to his paper.

334. Since 2009, WILLIAMS has verbally requested training on the backhoe, crane, valve and hydrant trucks on a number of occasions from Mr. Gillespie and other members of management. WILLIAMS was not given any of the requested training.

335.    In addition to the disparate training opportunities, DEFENDANT has adopted an unwritten policy that African-American are not to advance into supervisory positions within in the Water Maintenance Division. It is upon information and belief, that over the past forty years only two African-Americans have held such supervisory positions.

336.    In addition to the disparate training opportunities, DEFENDANT has adopted an unwritten policy that African-Americans are not to advance into supervisory positions within the Water Maintenance Division.

337.    In mid March of 2010, WILLIAMS became aware the PLAINTIFF BRADLEY had applied for a supervisory position and had been selected to undergo the interviewing process. WILLIAMS learned that the process encompassed both a written test and interview with a panel of three management level employees and that the written test portion included numerous questions requiring knowledge acquired through the operation of the valve, hydrant, backhoe and crane, none of which WILLIAMS and the other PLAINTIFFS had been trained on. WILLIAMS formed the belief that due to his lack of training he was placed in a distinct disadvantage when compared with his Caucasian counter-parts who had received such training, and thus had the necessary skills to do better on the supervisors test.

338.    WILLIAMS also became aware that the entire supervisor selection process was simply a façade, in that the Caucasian managers had already pre-determined what Caucasian employee would get the promotion, going so far as to provide the pre-determined candidate with the test answers.

339.    Soon after the interviewing process was completed, Caucasian Bobby Masopost, who had less tenure and experience on the job than PLAINTIFF BRADLEY, was promoted into the supervisor's position.

340. The previous occurrence was not an isolated incident. During WILLIAMS'S tenure, numerous Caucasian employees have been hired, and within less than one year been trained and promoted into supervisory positions, including, Clinny Crochet, Bobby Masopost, Brian Plank, Boss Dolen and Billy Overman.

341. WILLIAMS also became aware the PLAINTIFF JOHNSON has filed a formal grievance over such an incident on September 23, 2009, claiming that he had more tenure and experience than Clinny Crochet, a Caucasian, who had been moved into a supervisory position after only 90 days. JOHNSON had claimed the entire application and interview process was flawed. WILLIAMS learned that despite an investigation occurring which revealed "inconsistencies" in the interview/selection process, Crochet was still promoted into the supervisors position, even though he had less experience and tenure than JOHNSON.

342. Further, in 2010 WILLIAMS learned that PLAINTIFF GOODSON had assumed the position of "interim crew supervisor" while Emitt Sandridge took a leave of absence and that after working thirteen days in the position, GOODSON had inquired whether he would be paid at the supervisory level consistent with Departmental policy which calls for the increased pay after fifteen days. After General Supervisors Beverly Gillespie confirmed that the policy would be applicable, GOODSON was replaced by Wilford Sandridge, Caucasian, even though Sandridge was already supervising a different work crew.

343. Additionally, throughout his tenure, WILLIAMS has been advised that he will not qualify for advancement into a supervisory position until he obtains his CDL. WILLIAMS has requested the requisite training in order to obtain his CDL, the most recent occurring on or about January, 2012. WILLIAMS has been denied the training, which historically has been provided to Caucasian employees within the Water Maintenance Division.

344. Notably, current supervisors including Wilford Sandridge, James Kelly and Billy Overman did not possess a CDL at the time they were promoted into supervision, and it is upon information and belief that they still do not possess a CDL.

345. Significantly, throughout his tenure, WILLIAMS received yearly evaluations evidencing he met the DEFENDANTS job expectations. Regardless, rather than provide the necessary training and allow WILLIAMS to advance with the Water Maintenance Division, DEFENDANT re-hired a Caucasian, Wilford Sandridge, who had been terminated by the DEFENDANT.

346. During his tenure, WILLIAMS wanted to advance within the Water Maintenance Division, both through increased Band Levels as well as through promotions into supervisory positions. However, after requesting the necessary training on numerous occasions, to no avail; witnessing the treatment of the other PLAINTIFFS in their unsuccessful quests for advancement as well as his own; WILLIAMS was fully aware of the unwritten policy within the Division that African-Americans were neither to be provided with the necessary training to move upward within the Band Levels or to be considered for advancement into supervision. As a result, WILLIAMS did not apply for any other open supervisory positions, as he knew he would not be considered.

347. In addition, throughout his tenure, WILLIAMS has been subjected to disparate treatment through the assignment of over-time and duty-time. WILLIAMS and the other PLAINTIFFS have received less favorable days, including weekend and holiday assignments; and on average have received less scheduled over-time than their Caucasian counter-parts.

348.     Further, WILLIAMS and the other PLAINTIFFS have had their over-time hours decreased so that the over-time hours can be given to Chris Modin, a Caucasian who does not even work within the Water Maintenance Division.

349.     Ultimately, the Department of Public Utilities-Water Maintenance Division has historically been segregated, with Caucasians holding all upper management positions. Those same managers enacted procedures that ensured African-Americans, including WILLIAMS remained in the lowest paying positions with no opportunity to advance.     Upper management allows an atmosphere of racial intimidation through actively engaging in racial slurs, and threats and by refusing to take any remedial action when brought to their attention.     WILLIAMS and the other PLAINTIFFS are commonly referred to as the "nigger-8s", the "crazy 8", and "the trouble makers", by their Caucasian co-workers, who have selected and identified one room within the Water Maintenance Division as the "Country Club". The Caucasian employees, both management and hourly, spend time there, and it is made very clear that the African-American employees are not welcome. WILLIAMS has heard racial jokes and epithets coming from the room and has otherwise been excluded.   Further, each of the PLAINTIFFS were photographed and their picture hung in the Water Maintenance office by their supervisor so they were easily identifiable by all management level personnel, resulting in further isolation and ostracization.

350.     WILLIAMS has opposed these discriminatory practices on his own behalf and on behalf of other similarly situated minority employees on a number of occasions.   Including but not limited to on or about March 1, 2011 when WILLIAMS submitted a complaint to DEFENDANT'S Human Resources Department identifying disparate treatment relative to training opportunities, promotional opportunities, and the enforcement of internal policies; as well as racial harassment due to the continuous use of racial slurs and demeaning racial jokes.

351. In response to his complaints, WILLIAMS has been unfairly targeted, given disciplinary "write-ups" denied training and has been subjected to further harassment, intimidation, isolation, ostracism and retribution, including threats that he will lose his job due to poor performance all in retaliation for having opposed racial discrimination.

352. Specifically, WILLIAMS and the other PLAINTIFFS were required to attend a meeting on or about August 24, 2011 where they were advised that pursuant to Michael Bellman, the Deputy Director of the Department of Public Utilities, and Melvin Lee, the Operations Manager, "effective immediately" there would be strict enforcement of the DEFENDANT'S dress code, attendance policy and employee conduct policies. At that time, the PLAINTIFFS were advised by Warren Proffit, Caucasian supervisor, that if they did not increase their productivity their jobs would be outsourced to private contractors.

353. WILLIAMS interpreted the afore-statements as a threat to his continued employment with DEFENDANT and a strategic measure intended to force WILLIAMS to stop complaining about racial discrimination and harassment.

354. WILLIAMS and the other PLAINTIFFS filed a joint complaint of retaliation against Mr. Bellman and Mr. Lee for their conduct not only in the August 24th meeting, but also during subsequent meetings where the PLAINTIFFS were denigrated by both men who screamed disrespectfully at them, and told them that they had no say in any job related matter, and that "they did not work in a democracy".

355. During such a meeting, around November of 2011 Mr. Bellman began screaming at PLAINTIFF JOHNSON, in front of WILLIAMS, telling him to "shut up" and threatening him with insubordination when JOHNSON asserted that the PLAINTIFFS were being retaliated

against with regard to the enforcement of policies against them, but not the Caucasians within the DIVISION.

356. Around December 19, 2011 the DEFENDANT generated a memorandum identifying the enforcement of certain "policies" within the Water Maintenance Division. The memorandum states that "Water Maintenance personnel will not loiter in the personnel vehicle parking area, or on employee vehicles parked in the parking area, during work hours." It goes onto state "They are to do their work and if waiting for a supervisor, stand by the company vehicle or be with the supervisor." It is upon information and belief that no other Division within the Department of Public Works was affected by this memorandum, only the Water Maintenance Division where all the PLAINTIFFS work.

357. The December 19th memorandum intentionally targets WILLIAMS and the other PLAINTIFFS in that they historically wait outside in the parking lot near the company vehicles for their supervisors who work inside completing paperwork or obtaining work assignments.

358. Since the issuance of the December 19th memorandum, WILLIAMS has been threatened with being written up for "loitering" simply because he was standing in the parking lot area waiting for his supervisor to arrive.

359. WILLIAMS is aware that other PLAINTIFFS have received disciplinary actions under these new policies as well as under old policies that are being strictly enforced against the PLAINTIFFS, but not Caucasian employees, and is fearful that he will be terminated if he continues to advocate against racial discrimination and racial harassment within the CITY OF RICHMOND.

360. Additionally, WILLIAMS has received numerous disciplinary actions since complaining in March of 2011, including:

a.   a 10 day suspension without pay in October 2011, for allegedly threatening Caucasian Billy Purdy, Jr. with a gun. Although WILLIAMS denied having made any such threat and urged DEFENDANT to review the surveillance video to learn the truth. It did not. WILLIAMS does not deny having a verbal altercation with Purdy after Purdy insisted on calling him "boy" and threatening WILLIAMS;

b.   a verbal warning asserting he was "loitering" while sitting in his vehicle in January of 2012, something WILLIAMS denied;

c.   On February 3, 2012 WILLIAMS was notified he was accused of being "insubordinate" and "disruptive". Although WILLIAMS requested that he be allowed to file a complaint against a co-worker, Jerome Berry for harassment and retaliation, his request was denied. WILLIAMS challenged Lee on the unfairness of the policies within the Water Maintenance Division wherein the other employee Berry, was allowed to file a complaint against WILLIAMS. That complaint resulting in unfair disciplinary actions including unpaid time off work, and termination.

## VI. CAUSES OF ACTION

## COUNT I -VIOLATIONS OF 42 U.S.C. §1981

361.   Each of the PLAINTIFFS adopt and re-allege each and every allegation as set forth in Paragraph one (1) through three hundred and sixty (360) above as thought fully rewritten herein.

362.   The aforementioned acts of racial discrimination, harassment and retaliation occurred during each of the PLAINTIFFS tenure of employment with DEFENDANT.

363.   The aforementioned incidents alleged by each of the PLAINTIFFS establish the DEFENDANTS intentionally discriminated against them due to their race, as each has been subjected to disparate treatment compared to their Caucasian co-workers in regard to job classifications, compensation rates, promotions, overtime, the enforcement of DEFENDANTS policies and procedures and other conduct which may become known throughout the course of discovery.

364. The DEFENDANTS conduct in treating the PLAINTIFFS differently than their Caucasian co-workers was due, in whole or part, to their African-American race, which was a motivating factor or determinative factor for the disparate treatment.

365. The aforementioned acts of the DEFENDANT had the effect of unreasonably interfering with each of the PLAINTIFF'S equal enjoyment of the benefits of their employment contract, and created an intimidating, hostile and offensive work environment.

366. The aforementioned acts of the DEFENDANT pervaded the workplace and resulted in fear of, and actual adverse actions against each of the PLAINTIFFS.

367. The aforementioned acts of the DEFENDANT were intentional, mean spirited, done with malice and ill will. Further, DEFENDANT'S management ratified and actualized its discriminatory conduct, consistent with the mindset that discriminatory behavior was acceptable. And that any such complaints were to be responded to by an unrelenting barrage of retaliatory conduct including but not limited to isolation, demeaning work-assignments and comments, decreased compensation, and false accusations of impropriety.

368. The DEFENDANT'S actions in regard to compensation, training, promotions, over-time assignments, the enforcement of policies and procedures and issuance of disciplinary actions against each of the PLAINTIFFS reflect its longstanding pattern of allowing and condoning racial discrimination.

369. Further, the previously identified racially motivated treatment is a result of the DEFENDANTS longstanding official policies or customs allowing inadequate training, inadequate supervision and the failure to adopt needed policies within the DEPARTMENT even though the DEFENDANT was aware of ongoing racial discrimination and; allowing a custom to

exist within the DEPARTMENT so widespread and well settled that it was standard operating procedure not to evaluate, train, and promote African-American's within the DEPARTMENT.

370. Moreover, the DEFENDANT allowed and fostered a hostile work environment through its acceptance of racial intolerance against African-Americans, including the common use of racial slurs, jokes, and demeaning references to the PLAINTIFFS and its other minority employees.

371. The racial slurs, jokes and demeaning references made by DEFENDANTS Caucasian supervisors and hourly employees to the PLAINTIFFS were unwelcome.

372. The racial slurs, jokes and demeaning references made by DEFENDANTS Caucasian supervisors and hourly employees were motivated by the fact that the PLAINTIFFS are African-American.

373. The racial slurs, jokes, and demeaning references as set forth above, was so severe and pervasive that a reasonable person in the position of the PLAINTIFFS would find their work environment hostile or abusive.

374. Each of the PLAITNIFFS believed his work environment to be hostile or abusive as a result of the DEFENDANTS conduct, and/or its refusal to appropriately intervene to stop the racial slurs, jokes, demeaning references and overall abusive environment.

375. As depicted in the actions described above, the DEFENDANT significantly modified the terms, conditions benefits and privileges of the parties' contractual relationship, substantially impaired PLAINTIFFS' enjoyment of the privileges and benefits of their employment contract based on expressed intentional discrimination grounds, in violation of Section 1981 of the Civil Rights Act of 1866.

376. Each of the PLAINTIFFS suffered an adverse tangible employment action as a result of the hostile work environment described previously.

377. Through its highest level managers, DEFENDANT has historically engaged in, consented to, and/or condoned discrimination and harassment of African-American employees. Further, DEFENDANT has allowed its highest level managers and human resources department personnel to engage in retaliation against those employees who complain about the discriminatory and harassing behavior. DEFENDANT knew or should have knows that its high level managerial staff within the Department of Public Utilities were engaging in and condoning such conduct, since City wide policies and procedures were not being complied with, particularly with regard to the manner in which open positions were being filled within the Department.

378. In fact, in response to the PLAINTIFFS March 3, 2011 racial discrimination and harassment complaint, DEFENDANT'S Human Resources Department conducted an investigation. The findings support the PLAINTIFFS' claims, and specifically include the following:

a.     The Complainants allegations of disparaging racial remarks are founded. The casual use of the "N" word was allowed within the Water Department. When directed to specific employee in an offensive and derogatory manner, supervision did not address or discipline the employees within the department who made racial slurs, derogatory statements and jokes, failing to take appropriate corrective action. (Synopsis);

b.     The Caucasian employees are provided training opportunities to learn the Valve Hydrant Truck functions.....[including]... the shut down procedures which is a major skill set requirement. The Complainants lack of training limits their promotional opportunities.     Human Resources was not included on interview panels for past recruitments from 2009 to the present, which is against procedure. (Synopsis);

c.     The allegations of disparate treatment involving recruitment, promotional opportunities and application of policies, procedures and regulations were founded (Synopsis);

d.     There is a failure to monitor or provide oversight to ensure fairness as it relates to overtime and the on call duty roster.(Synopsis);

379. At all times asserted herein, each PLAINTIFF was in a contractual relationship with DEFENDANT, his employer. As a result of opposing racial discrimination, racial harassment, hostile work environment and retaliation, each PLAINTIFF enjoys the protections afforded under 42 U.S.C. §1981 against retaliation in employment.

380. At all times asserted herein, each PLAINTIFF was engaged in protected activity when he complained of and participated in the investigation of the racial discrimination, racial harassment, a hostile work environment and retaliation to DEFENDANT'S Human Resources Department, managerial level employees, as well as to the Equal Employment Opportunity Commission.

381. The DEFENDANT subjected each of the PLAINTIFFS to materially adverse employment actions after he engaged in the aforesaid protected activities. The actions include engaging in conduct intended to isolate each of the PLAINTIFFS, implementing policy changes to the Water Maintenance Division in order to target the PLAINTIFFS for disciplinary actions; allowing Caucasian co-workers to use racial slurs and other demeaning phrases toward the PLAINTIFFS with no recourse; refusing to provide training and opportunities for advancement within the Division; failing to properly compensate the PLAINTIFFS for over-time worked; failing to fairly provide over-time opportunities; and other actions intended to negatively impact the PLAINTIFF'S ability to perform their work assignments.

382. A causal connection exists between each of the PLAINTIFFS' protected activity as described above and the aforementioned conduct which would likely result in discouraging a reasonable employee from complaining about the racially disparate treatment and racially harassing conduct.

383. As a direct and proximate result of the DEFENDANT'S actions as described above, the PLAINTIFFS have suffered compensatory damages including, back pay, front pay, loss of income and benefits, pension and/or retirement benefits, impairment of earning capacity, emotional distress, anxiety, anguish, humiliation, and other incidental and consequential damages and expenses.

384. The DEFENDANT'S actions were intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of causing harm to the PLAINTIFFS. Thus each of the PLAINTIFFS is entitled to punitive damages under 42 U.S.C. §1981.

385. The DEFENDANT'S unlawful actions required the PLAINTIFFS to retain counsel to protect their rights and recover damages for them; and each PLAINTIFF should be awarded attorney's fees and costs.

## COUNT II
## VIOLATION OF TITLE VII (42 U.S.C.A. §2000e-5)

386. Each of the PLAINTIFFS adopt and re-allege each and every allegation as set forth in Paragraph one (1) through three hundred eighty five (385) above as thought fully rewritten herein.

387. At all times mentioned herein, each of the PLAINTIFFS was an employee within the meaning of Title VII, protected against discrimination in employment on the basis of race, in that each PLAINTIFF, as an African-American, is a member of a protected and recognized minority group or category.

388. At all times material hereto, DEFENDANT was an employer within the meaning of Title VII, having fifteen or more employees, and as such prohibited from discriminating in employment on the basis of race.

389.     Throughout their employment, the DEFENDANT by and through its agents, discriminated against each of the PLAINTIFFS on the basis of his race as alleged previously herein.

390.     DEFENDANT'S purported reasons for the actions taken against each of the PLAINTIFFS are pretext for discrimination.

391.     At all times asserted herein, each PLAINTIFF was an employee within the meaning of Title VII, protected against retaliation due to opposing actual or perceived discrimination in the workplace.

392.     As set forth above, each PLAINTIFF qualified for the protection provided by Title VII against retaliation in that they issued internal complaints of racial discrimination, racial harassment and retaliation to DEFENDANT; as well as filed a Charge of Discrimination with the EEOC.

393.     DEFENDANT, by and through its employees and agents, has retaliated against each of the PLAINTIFFS in violation of Title VII §704(a) of the Civil Rights Act of 1964, as amended, for challenging and/or reporting actual or perceived discrimination, and retaliatory actions as set forth above.

394.     The DEFENDANT subjected each of the PLAINTIFFS to adverse employment actions including, but not limited to, the actions previously described herein.  The aforesaid actions include engaging in conduct intended to isolate each of the PLAINTIFFS, implementing policy changes to the Water Maintenance Division in order to target the PLAINTIFFS for disciplinary actions;  allowing Caucasian co-workers to use racial slurs and other demeaning phrases toward the PLAINTIFFS with no recourse; refusing to provide training and opportunities

for advancement within the Division; and other actions intended to negatively impact the PLAINTIFF'S ability to perform their work assignments.

395. Each PLAINTIFF has been retaliated against by the DEFENDANT on the basis of his race; and because of his advocacy against the specified violations of Title VII by the DEFENDANT engaging in discriminatory conduct, through the acts and/or omissions alleged herein.

396. As a direct and proximate result of DEFENDANT'S racial discrimination, harassment and retaliation, each PLAINTIFF has suffered compensatory damages including loss of income and benefits, impairment of earning capacity, emotional distress, anxiety, anguish, humiliation, and other incidental and consequential damages and expenses.

397. The DEFENDANT'S unlawful actions required each PLAINTIFF to retain counsel to protect his rights and recover damages for him, and each PLAINTIFF should be awarded attorney's fees and costs.

## VI.    PRAYER FOR RELIEF

**WHEREFORE**, each PLAINTIFF seeks judgment against DEFENDANT CITY OF RICHMOND, and reserving the right to amend their Complaint, each PLAINTIFF respectfully requests the entry of a Judgment as follows:

(a) Declare and adjudge that the CITY OF RICHMOND has violated each of the PLAINTIFF'S rights under 42 U.S.C. §1981 and Title VII;

(b) Award nominal, compensatory, consequential and punitive damages, to the extent allowed under the law, to each of the PLAINTIFFS against the DFENDANT CITY OF RICHMOND under 42 U.S.C.§1981 and Title VII in amount(s) as determined at trial;

(c) Award all general and/or special damages each PLAINTIFF is entitled to under Federal Law including but not limited to back pay, front pay, lost earnings and medical and retirement benefits, preferential rights to jobs and other damages for

lost compensation and job benefits with pre-judgment and post-judgment interest suffered by each PLAINTIFF as determined at trial;

(d)   Award each PLAINTIFF the costs and expenses incurred in this action, including reasonable attorneys' fees and other litigation expenses as provided by Federal Law;

(e)   Award statutory interest as provided by Federal Law; and

(f)   Award each PLAINTIFF any such additional relief as this Court deems just and proper.

## V.   JURY DEMAND

The PLAINTIFF'S hereby requests a trial by jury on all issues.

Dated: September  _14th_ , 2012.

MARCUS BRADLEY, JASON GOODSON, TORE HARRIS, ERIC JOHNSON, ELWOOD MAYFIELD, GABRIEL POSEY, LAWRENCE SMITH, JR. AND MILTON WILLIAMS,

By _____
Counsel

A. Donald McEachin, Esq. (VBS#27054)
Curtis M. Hairston, Jr., Esq. (VSB#28093)
**McEachin & Gee, P.C.**
4719 Nine Mile Road
Henrico, VA  23223-4908
(804) 226-4111      telephone
(804) 226-8888      facsimile

Lorenzo Williams, Esq
Debra Nolan, Esq.
The Law Firm of Gary, Williams, Lewis & Watson, PL
221 Southeast Osceola Street
Stuart, FL  34994
(772) 283-8260      telephone
(772) 781-1487      facsimile

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

On this 14th day of September 2012, I hereby certify that a true copy of the foregoing document was mailed, postage prepaid, to:

Allen L. Jackson, Esq. City Attorney
900 E Broad Street, Suite 300
Richmond, VA 23219

The Honorable Mayor Dwight C. Jones
City of Richmond
900 E Broad Street, Suite 201
Richmond, VA 23219